[No. C020197. Third Dist. Oct. 31, 1996.]

WESTERN/CALIFORNIA, LTD., et al., Plaintiffs and Appellants, v. DRY CREEK JOINT ELEMENTARY SCHOOL DISTRICT, Defendant and Appellant.

1464

## COUNSEL

Gregory D. Thatch and Larry C. Larsen for Plaintiffs and Appellants.

Gary G. Kreep and Kevin T. Snider as Amici Curiae on behalf of Plaintiffs and Appellants.

Laurence B. Labovitz, Eisen & Johnston, Jay-Allen Eisen and Marian M. Johnston for Defendant and Appellant.

Kronick, Moskovitz, Tiedemann & Girard, P. Addison Covert, Pinnell & Kingsley, Paul Nicholas Boylan, Joseph R. Symkowick and Edmundo R. Aguilar as Amici Curiae on behalf of Defendant and Appellant.

## OPINION

**SIMS, J.**—Pursuant to statutory authorization in place between January 1, 1993, and November 2, 1993 (former Gov. Code, § 65995.3,[1] Stats. 1992, ch. 1354, § 5; Sen. Bill No. 1287 (1991-1992 Reg. Sess.) (Senate Bill 1287)), appellant Dry Creek Joint Elementary School District adopted a district-wide development fee of $1 per square foot on residential development for purposes of construction or reconstruction of school facilities. The fees were imposed on and paid under protest by developers in one part of the district—the Antelope area—which was already subject to "Mello-Roos" community facilities taxes (§ 53311 et seq.) for school facilities purposes.

---

[1]Undesignated statutory references are to the Government Code.

Former section 65995.3 provided: "(a) In addition to the fee, charge, dedication, or other requirement specified in subdivision (b) of Section 65995, an additional fee, charge, dedication, or other requirement of one dollar ($1) per square foot of assessable space may be levied by the governing board of a school district against that residential construction described in subparagraphs (B) and (C) of paragraph (1) of subdivision (a) of Section 53080 for the construction or reconstruction of school facilities.

"(b) This section shall remain in effect only until the date that Assembly Constitutional Amendment 6 of the 1991-92 Regular Session fails to receive the approval of a majority of voters voting on the measure, and as of that date this section is repealed." (Stats. 1992, ch. 1354, § 5.)

This mandamus action (Code Civ. Proc., § 1085) seeking refunds was then filed by the developers—Western/California, Ltd., a California Limited Partnership; U.S. Home Corporation, a Delaware Corporation, doing business as US Home; George Wimpey, Inc., a Delaware Corporation, doing business as Morrison Homes; Winncrest Homes, a California Corporation; and J&L Properties, California General Partnership (hereafter, the developers).[2]

The developers argued among other things that the fee could not be imposed on the Antelope area because the fee, when added to the existing Mello-Roos taxes, exceeded a statutory restriction on development fees and requirements (§ 65996, subd. (b), hereafter section 65996(b)[3]). The district's opposing position was that Mello-Roos taxes do not count in calculating the maximum development fees and requirements (former § 65996(b), § 65995[4]).[5]

The trial court entered judgment in favor of the developers and directed issuance of a peremptory writ of mandate commanding the district to refund the fees paid by the developers. On appeal, the district contends (1) the action is barred by the statute of limitations, and (2) the trial court erred in concluding the exemption of Mello-Roos taxes from the restriction on development requirements applied only to Mello-Roos taxes adopted in the future. The developers, in addition to defending against the appeal, filed a protective cross-appeal, contending the judgment may be affirmed on the alternative grounds that (1) the fee was imposed without establishing the required nexus between the fee and school needs created by the residential development and therefore was an invalid special tax, and (2) the fee was

[2]The developers acquiesce in the use of the term "developers" to describe them but state they were at all relevant times home builders actively building homes.

[3]At the time in question, section 65996(b) provided: "No public agency shall, pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code [California Environmental Quality Act or CEQA] or Title 7 (commencing with Section 65000) [planning and land use], deny approval of a project on the basis of the adequacy of school facilities, or impose conditions on the approval of a project for the purpose of providing school facilities that exceed the amount authorized pursuant to this chapter." (Stats. 1992, ch. 1354, § 7.)

[4]Section 65995 places a cap of $1.50 per square foot (adjusted periodically for inflation) on fees and other requirements that may be imposed on residential development and prohibits any other fees and requirements but provides in subdivision (f): "Nothing in this section shall be interpreted to limit or prohibit the use of Chapter 2.5 (commencing with Section 53311) of Division 2 of Title 5 [Mello-Roos taxes] to finance the construction or reconstruction of school facilities." (See Stats. 1992, ch. 1354, § 4.)

[5]As will appear, sections 65995 and 65996 were enacted in 1986. (Stats. 1986, ch. 887.) However, amendments were made in 1992 which were in effect at the time in question but were subsequently repealed by their own terms (Stats. 1992, ch. 1354, §§ 4, 7) and replaced by alternate versions similar to the pre-1992 versions of the statutes. (Stats. 1992, ch. 1354, §§ 3, 6; Stats. 1989, ch. 1209, §§ 25, 27.5.) Where appropriate, we hereafter refer to the pertinent provisions as "former" statutes.

procedurally defective for failure to give appropriate notice to the County of Sacramento. We shall conclude the developers' action was not barred by the statute of limitations, but the developers were not entitled to a refund, because Mello-Roos taxes are not a factor in the statutory cap on development fees and requirements. We shall further conclude the cross-appeal has no merit. We shall therefore reverse the judgment.[6]

## FACTUAL AND PROCEDURAL BACKGROUND

The territory of the district spans Sacramento County and Placer County. The Antelope area, which is at issue in this appeal, is the Sacramento County portion of the district.[7]

In 1986, the Legislature enacted Assembly Bill No. 2926 (Assembly Bill 2926) (Stats. 1986, ch. 887), giving school districts express authority to impose fees on development projects to help pay for construction of school facilities. (§ 53080; Stats. 1986, ch. 887, § 8, pp. 3080-3081.) However, in this case the developers (or their predecessors in interest) negotiated with the district and the county to avoid Assembly Bill 2926 fees and in August 1988 entered into a "school financing settlement agreement," whereby (1) the developers agreed to support formation of a Mello-Roos tax district (§ 53311 et seq.) in the Antelope area for purposes of construction of new school facilities made necessary by their residential development, (2) the district agreed not to seek a building moratorium in the impacted area and not to impose Assembly Bill 2926 fees in that area, and (3) the county, as the local

---

[6]The action also sought a writ of mandate against the County of Sacramento. The trial court entered judgment against the county, directing that a peremptory writ of mandate issue commanding the county to issue building permits, final permits and certificates of occupancy to the developers for the subject properties without requiring proof of payment of the disputed developer fees. The county does not appeal, but we shall reverse the entire judgment, thereby reversing the judgment as to the county as well. (See *Estate of McDill* (1975) 14 Cal.3d 831, 840 [122 Cal.Rptr. 754, 537 P.2d 874] [entire judgment may be reversed upon appeal by one party where issues interwoven].)

We granted requests to file amicus curiae briefs by California School Board Administration, California Department of Education, Folsom Cordova Unified School District, Oakley Union Elementary School District, and United States Justice Foundation.

[7]The district has three areas—Antelope, Placer County, and Roseville. The district informs us the historical reason for this division was that school districts previously were unable to impose school impact fees on their own but had to ask that they be imposed by the local city or county. (*Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911, 917 [16 Cal.Rptr.2d 226, 844 P.2d 545].) The developers request that we disregard this assertion for failure to cite to the record. However, for our purposes, the citation to *Grupe* suffices. As we discuss *post*, the district asserts there is no longer any need for the division, and the district's authority is district-wide. The developers maintain that, since the separate divisions exist, the district must make division-wide, rather than district-wide, determinations regarding reasonable nexus between development fees and school needs created by development.

agency responsible for the general plan, zoning, and issuance of building permits, agreed not to restrict approval of building permits based on school conditions. The agreement recognized "the only practical method for permitting development to continue within the [Antelope area], while also ensuring that adequate school facilities will be constructed to accommodate the students generated by such development, is to create a Mello-Roos district within the [Antelope area]."

The agreement was premised on a 50/50 split between state and local funding. The parties intended that the Mello-Roos taxes would finance 50 percent of school construction costs in the Antelope area, with state funds providing the other 50 percent. The district was responsible for pursuing all available sources of funding. It was agreed that Assembly Bill 2926 fees (limited by statute to approximately $1.50 per square foot, adjusted periodically for inflation) would not have provided sufficient funds to meet the need created by the residential development.

On November 3, 1988, the district established Mello-Roos Community Facilities District No. 1 (CFD No. 1) in the Antelope area, to provide local funding for school facilities in that portion of the district. At an election held on December 20, 1988, the developers (or their predecessors in interest), as property owners in CFD No. 1, approved its formation and authorized the issuance of up to $30 million in Mello-Roos bonds and the levy and collection of a special tax to pay the principal and interest thereon. The district subsequently did an initial issuance of bonds in the amount of $6 million, resulting in Mello-Roos taxes once the property was developed.[8]

The school financing settlement agreement was later amended in October 1988 to provide that the Mello-Roos taxes would be credited against Assembly Bill 2926 fees the district could have imposed. This was done so the high school district in the area would not assess the district's share of the Assembly Bill 2926 fees.

The original agreement expired on February 28, 1989.

By the time of trial, the district had received $11 million in state matching funds. It had also imposed Assembly Bill 2926 fees in the other two areas of the district.

---

[8]The developers assert the Mello-Roos tax was equivalent to $3.52 per square foot. However, it is not clear whether this would be the figure to fund the entire cost of school facilities—which, as we discuss *post*, the developers assert the Mello-Roos tax is capable of funding—or half the cost, as intended.

The district notes it is undisputed that the Mello-Roos taxes are not imposed on vacant land and therefore the ultimate burden of the Mello-Roos taxes will fall on the eventual home purchasers, rather than the developers. However, the existence of these taxes might affect marketability of the homes, and the district does not dispute the developers' standing to pursue this action.

The local funds available to the district from development fees and Mello-Roos special taxes fell below what the district needed to keep up with increased student enrollment resulting from residential development. In 1990, the district projected it needed at least $3.5 million per year for the next 10 years to meet anticipated growth from existing approved projects and building permit activity. A 1992 analysis indicated the unfunded shortfall ($36,321,133) translated to $2.74 per square foot of residential development.

In 1992, the district faced the risk that state funding would be unavailable. Assembly Constitutional Amendment 6, 1991-1992 Regular Session, placed Proposition 170 before the voters in the November 1993 statewide election. (Ballot Pamp., Proposed Amends. to Cal. Const., Statewide Elec. (Nov. 2, 1993) Prop. 170, pp. 16-19, 40-41; see Stats. 1992, ch. 1354, §§ 2, 7, 10.) If passed, Proposition 170 would allow school construction taxes to be approved by a simple majority (rather than two-thirds) vote. (*Ibid.*)

Also in 1992, the Legislature enacted Senate Bill 1287, which provided that if the voters adopted Proposition 170, the state matching funds program would be eliminated in January 1996. (Stats. 1992, ch. 1354.) One provision of Senate Bill 1287 added to section 65995.3, authorizing school districts to impose an additional fee of $1 per square foot on residential development. Senate Bill 1287 specified section 65995.3 (and other provisions of the bill) would be repealed if the voters rejected Proposition 170 in the November 1993 statewide election. (Stats. 1992, ch. 1354, § 5.)

On January 7, 1993, pursuant to Senate Bill 1287, the district adopted Resolution No. 1993-4, imposing a district-wide fee of $1 per square foot on all residential development. The resolution became effective 60 days later, on March 8, 1993.

The developers were required to pay Senate Bill 1287 fees for their projects, beginning in May 1993, and did so under protest, complaining that the Mello-Roos taxes plus the Senate Bill 1287 fee exceeded the statutory cap on development fees and requirements.[9] The district's position was that Mello-Roos taxes were statutorily excluded from calculation of the maximum development requirements which could be imposed.

---

[9]The developers assert the statutory cap on development fees and requirements was then about $1.65 per square foot, plus the $1 per square foot authorized by Senate Bill 1287, for a total of $2.65 per square foot. The district disputes the figure. The exact figure is not essential to our disposition.

In the November 1993 election, the voters rejected Proposition 170, and consequently the district's authority to impose the additional $1 per square foot fee expired. (Stats. 1992, ch. 1354, § 5.) The district then repealed the fee.

On November 5, 1993, the developers filed their petition for writ of mandate (Code Civ. Proc., § 1085) and complaint for breach of contract in the trial court. As alleged in an amended petition and a supplemental petition, and as admitted in the district's answer, each developer was "required to pay" the Senate Bill 1287 fee beginning in May 1993, as a condition to receipt of a certification needed for issuance of further building permits or certificates of occupancy. The developers sought a refund of the fees paid under protest.

The district's demurrer to several causes of action was sustained without leave to amend, and the case proceeded to a hearing on the following theories: (1) the Senate Bill 1287 fees exceeded the statutory limit on development fees and requirements (§ 65996) that local government could impose on private property owners for school facility purposes (second cause of action); (2) the Senate Bill 1287 fees exceeded the reasonable cost of providing the services and facilities for which the new fees were imposed in the Antelope area and, as a result, constituted an impermissible special tax (first and fifth causes of action); (3) breach of contract and promissory estoppel (eighth and ninth causes of action); (4) the district failed to provide necessary documentation of the fee adoption to the county, as required by section 53080.1 (seventh cause of action); and (5) the county was refusing to issue permits without certification from the district that the Senate Bill 1287 fees had been paid (tenth cause of action).

Of the foregoing, the theories pertinent to this appeal are: (1) the Senate Bill 1287 fees exceeded the statutory limit that could be imposed on private property owners for school facility mitigation (second cause of action); (2) the Senate Bill 1287 fees exceeded the reasonable cost of providing the services and facilities for which the new fees were imposed in the Antelope area and, as a result, constituted an impermissible special tax (first and fifth causes of action); and (3) the district failed to provide necessary documentation of the fees to the county, as required by section 53080.1 (seventh cause of action). The parties do not pursue the contract claims on appeal.

A hearing on the mandamus petition was held in September 1994.

In October 1994, the trial court issued a written "decision and order," concluding the developers were entitled to relief only on their second cause

of action (violation of former section 65996—fee in excess of statutory limit) and their tenth cause of action (against the county for failure to issue permits). Although the statutory cap excluded Mello-Roos taxes, the trial court believed the exclusion was only for Mello-Roos taxes adopted in the future. The trial court determined the developers were not entitled to relief on their other causes of action. No statement of decision (Code Civ. Proc., § 632) was requested.

In November 1994, the trial court entered judgment in favor of the developers, ordering that a peremptory writ of mandate issue commanding the district to cease requiring payment of the dollar-per-square-foot fee as a condition of certification for the developers' residential property within the boundaries of CFD No. 1 in the Antelope area, and further directing the district to refund to the developers the fees paid (totaling more than $400,000), plus interest. The judgment also ordered that a peremptory writ of mandate issue against the county, pursuant to the developers' 10th cause of action, commanding the county to issue permits and certificates of occupancy to the developers in the subject area without first requiring proof of payment of the developer fees.

The district appeals. The developers filed a protective cross-appeal, arguing the trial court should have granted judgment in their favor on the first, fifth and seventh causes of action.

## DISCUSSION

### I. Statute of Limitations

The district contends the action is barred because it was not filed within the 120-day limitations period of section 66022,[10] which prescribes time limits for attacking an ordinance or resolution adopting a new fee. The

[10]Section 66022 provides in part: "(a) Any judicial action or proceeding to attack, review, set aside, void, or annul an ordinance, resolution, or motion adopting a new fee or service charge, or modifying or amending an existing fee or service charge, adopted by a local agency, as defined in Section 66000, shall be commenced within 120 days of the effective date of the ordinance, resolution, or motion. . . .

"(b) Any action by a local agency or interested person under this section shall be brought pursuant to Chapter 9 (commencing with Section 860) of Title 10 of Part 2 of the Code of Civil Procedure.

"(c) This section shall apply only to fees, capacity charges, and service charges described in and subject to Sections 66013 and 66014 [fees charged in connection with building permits, etc.]."

district further contends that even if we find applicable the 180-day limitations period of section 66020[11] for actions protesting imposition of a fee on a specific development and seeking a refund of fees paid under protest, the action was still untimely. We shall conclude the district has failed to show any basis for reversal.

### A. *The 120-day Limitations Period Does Not Control*

Resolution No. 1993-4 was adopted on January 7, 1993, and became effective 60 days later, on March 8, 1993. If the 120-day limit of section

---

[11]Section 66020 provides in part: "(a) Any party may protest the imposition of any fees . . . imposed on a residential housing development by a local agency by meeting both of the following requirements: [¶] (1) Tendering any required payment in full [or making arrangements to ensure performance]. [¶] (2) Serving written notice [containing specified information, including legal theory of protest].

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) Where a reviewing local agency makes proper and valid findings that the construction of certain public improvements or facilities, the need for which is directly attributable to the proposed residential housing development, is required for reasons related to the public health, safety, and welfare, and elects to impose a requirement for construction of those improvements or facilities as a condition of approval of the proposed development, then in the event a protest is lodged pursuant to this section, that approval shall be suspended pending withdrawal of the protest, the expiration of the limitations period of subdivision (d) without the filing of an action, or resolution of any action filed. . . .

"(d) A protest filed pursuant to subdivision (a) shall be filed at the time of approval or conditional approval of the development or within 90 days after the date of the imposition of the fees . . . to be imposed on a residential housing development. Any party who files a protest pursuant to subdivision (a) may file an action to attack, review, set aside, void, or annul the imposition of the fees . . . imposed on a residential housing development by a local agency within 180 days after the date of the imposition. Thereafter, notwithstanding any other law to the contrary, all persons are barred from any action or proceeding or any defense of invalidity or unreasonableness of the imposition. . . .

"(e) If the court finds in favor of the plaintiff in any action or proceeding brought pursuant to subdivision (d), the court shall direct the local agency to refund the unlawful portion of the payment, with interest . . . .

"(f)(1) If the court grants a judgment to a plaintiff invalidating, as enacted, all or a portion of an ordinance or resolution enacting a fee . . . , the court shall direct the local agency to refund the unlawful portion of the payment, plus interest . . . .

"[(f)] (2) If an action is filed within 120 days of the date at which an ordinance or resolution to establish or modify a fee . . . to be imposed on a residential housing development takes effect, the portion of the payment . . . invalidated shall also be returned to any other person who, under protest pursuant to this section and under that invalid portion of that same ordinance or resolution as enacted, tendered the payment . . . during the period from 90 days prior to the date of the filing of the action which invalidates the payment . . . to the date of the entry of the judgment referenced in paragraph (1).

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"(h) The imposition of fees . . . occurs, for the purposes of this section, when they are imposed or levied on a specific development."

66022 applies, the deadline for filing this action was July 6, 1993. This action was not filed until November 5, 1993.

Preliminarily, we note the district raised its section 66022 defense by way of answer and unsuccessful demurrer in the trial court. Contrary to the developers' suggestion, the district was not required to reassert the defense at the hearing on the mandamus petition in order to preserve the issue for appeal. (Code Civ. Proc., § 906.)

It appears the district's argument that the 120-day limit of section 66022 controls is based on its misperception that section 66022 is the sole avenue for any claim which in any way challenges the validity of the resolution adopting a development fee. According to the district, an attack which threatens the validity of the resolution itself must be pursued under section 66022, whereas actions seeking refund of fees paid under protest pursuant to section 66020 are restricted to claims that merely challenge a fee as applied to a particular project (e.g., whether a fee was properly calculated based on square footage of the development).[12]

However, a protest action under section 66020 may raise claims implicating the validity of the resolution itself, because section 66020 itself contemplates that a protest action brought under that statute may result in invalidation of a resolution which adopted a fee. Thus, subdivision (f) of section 66020 provides in part: "If the court grants a judgment to a plaintiff invalidating, as enacted, all or a portion of an ordinance or resolution enacting a fee . . . , the court shall direct the local agency to refund the unlawful portion of the payment . . . ."[13] (§ 66020, subd. (f), fn. 11, *ante.*)

We recognize that in this case, the judgment did not expressly invalidate all or part of the resolution, and the developers assert on appeal that they did not (and could not) attack the resolution itself.

---

[12]Amici curiae Folsom Cordova Unified School District and Oakley Union Elementary School District argue section 66022 does not apply to developer fee disputes at all but rather applies only to water/sewer connection fees and administrative processing/regulatory fees. For purposes of this appeal, we need not decide the matter but will assume for the sake of argument that section 66022 applies to the type of developer fees at issue in this case.

[13]Subdivision (f) of section 66020 further provides that if the judgment invalidates all or a portion of the ordinance or resolution, the local agency must also give a refund to certain *non*parties who paid under protest, *if* the action was filed within 120 days of the date the ordinance or resolution went into effect. However, the 120-day restriction does not apply to parties.

This subdivision was added to the statute in 1992 (Stats. 1992, ch. 605, § 1), and thus was in effect at all times pertinent to this case following the January 1993 adoption of the resolution imposing the fee. We therefore need not address the district's case citations which predate the 1992 amendment, cases which the district cites for the proposition that a short limitations period is necessary to facilitate governmental planning.

In any event, the point is that a protest action under section 66020 may raise issues implicating the validity of the resolution which adopted the fee. Thus, if the developers in effect attacked the resolution itself (as asserted by the district and denied by the developers), this posture would not preclude the developers from proceeding under the 180-day limitations period of section 66020.

Where both the 120-day and 180-day statutes may be said to apply, the 180-day statute, as the more specific provision, controls. (*North State Development Co.* v. *Pittsburg Unified School Dist.* (1990) 220 Cal.App.3d 1418, 1425 [270 Cal.Rptr. 166] [discussing predecessor statutes, former §§ 66008 & 54995].)

The district nevertheless argues section 66020 does not apply because the developers did not challenge imposition of the fee on specific developments at all, but attacked only the resolution itself. The district asserts the only cause of action on which the developers prevailed against the district was a cause of action challenging *adoption* of the fee, not imposition of the fee on a specific development.

We disagree. The cause of action on which the developers prevailed as against the district—the second cause of action—was entitled "Violation of [former] § 65996—Fee in Excess of Statutory Limit." It alleged that at the time the fee was adopted, the district was receiving Mello-Roos taxes from CFD No. 1, and the fee together with the taxes would exceed the maximum amount authorized to be collected from residential development by former section 65996.

However, the second cause of action also incorporated by reference the preceding general allegations that each developer was required to pay a fee in a specified amount in order to obtain a certificate necessary to continue with its development project, and the fees were paid under protest. Thus, the second cause of action attacked imposition of specific fees on specific projects.

The district says we cannot view this case as an attack on imposition of the fee on particular projects, because *San Marcos Water Dist.* v. *San Marcos Unified School Dist.* (1987) 190 Cal.App.3d 1083 [235 Cal.Rptr. 827], said a "limitations period must be based on the characterization of the charge proffered by the imposing entity . . . ." (*Id.* at p. 1086.) However, the district misreads this quotation. The *San Marcos* court was saying it would apply the statute of limitations applicable to "charges," even though the California Supreme Court had determined the fee at issue was a special

assessment rather than a user charge. (*Ibid.*) *San Marcos* did not allow the imposing entity to characterize the opponent's complaint. Moreover, *San Marcos* actually supports the developers in this case. The issue there was whether a school district was entitled to a refund of capacity fees paid to a water district after the Supreme Court held the fees constituted special assessments from which governmental entities were exempt. (*Id.* at pp. 1084-1085.) The Fourth District held the school district was barred from obtaining a refund by the 120-day limitations period. (*Id.* at pp. 1085-1086.) The court noted, however, the school district "could have avoided any question in this case by utilizing the simple procedure of paying the fees under protest." (*Id.* at p. 1086, fn. omitted.)

We conclude this action is not barred by section 66022.

B. *Timeliness Under 180-day Limitations Period*

■ The district next contends that even if the 180-day limit of section 66020 applies, the action was still untimely under that provision's requirement that the action be filed within 180 days of "imposition" of the fee.

However, as the developers point out, the district did not raise this matter—which presents a factual question—in the trial court, and has therefore failed to preserve the issue for appeal. (*Hittle* v. *Santa Barbara County Employees Retirement Assn.* (1985) 39 Cal.3d 374, 391, fn. 10 [216 Cal.Rptr. 733, 703 P.2d 73].)

This issue presents a factual question because the 180 days begins to run from the date of "imposition" of the fee, which is the date the fees "are imposed or levied *on a specific development.*" (§ 66020, subd. (h) quoted at fn. 11, *ante,* italics added.) The date of imposition is a factual question that can vary from case to case. (*Ponderosa Homes, Inc.* v. *City of San Ramon* (1994) 23 Cal.App.4th 1761, 1770 [29 Cal.Rptr.2d 26]; *North State Development Co.* v. *Pittsburg Unified School Dist., supra,* 220 Cal.App.3d at p. 1427.)

Contrary to the district's claim, the resolution itself did not impose fees on *specific* developments. Therefore, the effective date of the resolution did not trigger the 180-day limitations period.

The district in its reply brief wrongly states that the section 66020 defense "was raised both by affirmative defense and by demurrer." However, the cited portions of the record show only that section 66020 was raised as an affirmative defense in the district's answer to the pleading. The portion of the demurrer cited by the district in its reply brief contains no argument that

the action is barred under the 180-day limitations period of section 66020. Moreover, we see no facts alleged in the pleading which would allow the issue to be resolved by demurrer.

Elsewhere in its demurrer, the district asserted section 66020 provided the exclusive method for challenging the imposition of a development fee and therefore the developers' breach of contract cause of action was improper as it was unrelated to the specifics of a section 66020 protest action. The district concluded its demurrer by requesting that the trial court "grant this Demurrer in its entirety, without leave to amend, and allow this Petition for Writ of Mandate to proceed to a trial on the merits only on the basis of a fee protest pursuant to the provisions of [section] 66020 . . . ."

On appeal, the district in its reply brief says it merely meant the developers should be able to challenge matters such as whether the fees were properly calculated as to square footage. However, by agreeing that some claims were viable, the district implicitly concedes the action was timely under the 180-day statute.

We conclude the district fails to show any statute of limitations bar to this action.

We turn now to the question whether Mello-Roos taxes are to be taken into account in determining whether a school district has exceeded the statutory cap on development fees and requirements.

II. *Exemption of Mello-Roos Taxes From Statutory Cap on Development Fees*

 The district contends the trial court erred in granting the developers relief based on former section 65996(b), quoted at footnote 3, *ante*, because that statute placed restrictions only on planning agencies authorized to approve development projects, such as cities and counties. The district also contends that, assuming former section 65996(b) applies, nothing supports the trial court's conclusion that section 65995's (quoted at fn. 4, *ante*) exemption for all Mello-Roos taxes is limited to subsequently-adopted Mello-Roos taxes. We shall conclude former section 65996(b) applied to school districts as well as planning agencies. We shall further conclude the fee in this case did not violate former section 65996(b) because that statute, by reference to section 65995, excluded Mello-Roos taxes, and nothing supports a construction that the legislation exempted only future Mello-Roos taxes. Consequently, we shall conclude the judgment in favor of the developers must be reversed.

## A. Standard of Review

■ The question whether the district was statutorily precluded from imposing the dollar-per-square-foot fee on the developers presents a "legal question whether an agency acting in its quasi-legislative capacity has exceeded its authority." (*Shapell Industries, Inc.* v. *Governing Board* (1991) 1 Cal.App.4th 218, 233 [1 Cal.Rptr.2d 818].) This court conducts de novo review of questions of statutory construction. (*San Miguel Consolidated Fire Protection Dist.* v. *Davis* (1994) 25 Cal.App.4th 134, 146 [30 Cal.Rptr.2d 343].)

## B. Statutory Background

*Grupe Development Co.* v. *Superior Court* (1993) 4 Cal.4th 911 [16 Cal.Rptr.2d 226, 844 P.2d 545], recounted the legislative history of school facility financing as follows:

The financing of public school facilities has traditionally been the responsibility of local government. (*Grupe Development Co.* v. *Superior Court, supra*, 4 Cal.4th at p. 915.) School districts supported their activities mainly by levying ad valorem taxes on real property within their districts—issuing local bonds repaid from real property taxes. (*Id.* at p. 916.) The early 1970's saw an increase in residential development leading to school overcrowding, coupled with increased resistance to rising property taxes. (*Ibid.*) Looking for other ways to finance school needs, local governments began to impose fees on developers to cover the costs of new school facilities made necessary by the new housing. (*Ibid.*) The courts upheld these "school-impact fees" as a valid exercise of the police power (Cal. Const., art. XI, § 7) if the local entity demonstrated a reasonable relationship between the fee imposed and the need for increased facilities created by the development. (4 Cal.4th at p. 916.)

"In 1977 the Legislature took its first major step towards a statewide solution to the problem, by granting local governments specific legislative authorization—i.e., in addition to their constitutional police power—to impose school-impact fees: 'In 1977, with the passage of Senate Bill No. 201 (The School Facilities Act, effective Jan. 1, 1978), the Legislature specifically authorized cities and counties to enact ordinances requiring residential developers to pay fees to finance temporary school facilities necessitated by new development. In the preamble to the act, the Legislature set forth its findings that "residential developments may require the expansion of existing public schools or the construction of new school facilities" and that "funds for the construction of new classroom facilities are not available

when new development occurs, resulting in the overcrowding of existing schools." Therefore, "new and improved methods of financing for interim school facilities necessitated by new development are needed in California." [Citation.]' [Citation.]

"The School Facilities Act, however, was not a complete solution. It did not authorize school districts to impose school-impact fees themselves. The statute merely authorized each school district, when appropriate, to make 'findings' that its schools were overcrowded and there was no feasible method of reducing that condition, and to transmit those findings to the local city council or county board of supervisors; if the latter concurred in the findings, that concurrence furnished a legal basis for the local government to impose the school-impact fees by ordinance. (§§ 65971-65972.) The fees could be used only to provide 'interim,' i.e., temporary, classroom facilities. (Now § 65974, subd. (a)(3).) The amount of the fees, as before, was required to be 'reasonably related and limited to the need for schools caused by the development.' [Citation.] And, . . . in enacting the School Facilities Act the Legislature did not occupy the field of school construction financing and did not preempt local ordinances imposing school-impact fees under the police power. [Citation.]

"Nine years later the Legislature reentered the field of school financing, and this time fully and expressly occupied it. (Stats. 1986, chs. 886, 887, 888, 889.) 'The School Facilities Act, as originally enacted, proved to be a stopgap measure. [Citation.] In 1986 it was substantially revised and expanded with the passage of a comprehensive multibill package, addressing an identified $3.8 billion need for new permanent school facilities to meet the demands of an expanding population. The heart of this legislation, Assembly Bill No. 2926, consolidated the legal authority for assessment of developer fees for school facilities into a single body of law. It authorized the governing boards of the school districts themselves, rather than city councils or county boards of supervisors, to impose school-impact fees districtwide, subject to certain monetary limitations.' [Citation.]

"Dispelling any doubt as to its intent, the Legislature declared in the subject bill that in many parts of California real property development was causing serious overcrowding in schools that traditional public financing was inadequate to relieve, and 'For these reasons, a comprehensive school facilities finance program based upon a partnership of state and local governments and the private sector is required to ensure the availability of school facilities to serve the population growth generated by new development.' (Stats. 1986, ch. 887, § 7, subd. (d), p. 3080.) Finally, 'The Legislature therefore finds that the levying of appropriate fees by school district

governing boards at the rates authorized by [Assembly Bill 2926] is a reasonable method of financing the expansion and construction of school facilities resulting from new economic development with the district.' (*Id.*, subd. (e) . . . .)

"Implementing these findings, the Legislature enacted, among many provisions, sections 53080 and 65995. Subdivision (a) of section 65995 now declares that 'Except for a fee, charge, dedication, or other requirement authorized under Section 53080 [or under the 1977 School Facilities Act] . . . no fee, charge, dedication, or other requirement shall be levied by the legislative body of a local agency against a development project . . . for the construction or reconstruction of school facilities.' In turn, subdivision (a)(1) of section 53080 authorizes the governing board of any school district to levy such a 'fee, charge, dedication, or other requirement' for the construction or reconstruction of school facilities, but expressly subjects that authorization to the limits imposed by subdivision (b) of section 65995. And the latter clause provides that in the case of residential development 'In no event shall the amount of any [such] fees, charges, dedications, or other requirements,' including any fees imposed under the 1977 School Facilities Act, exceed the rate of $1.50 per square foot of assessable space.

"Equally important . . . , 'Assembly Bill No. 2926 was intended to provide the exclusive method of raising local financing for permanent school facilities.' [Citation.] Thus subdivision (d) (now subdivision (e)) of section 65995 stated unequivocally: 'The Legislature finds and declares that the subject of the financing of school facilities with development fees is a matter of statewide concern. For this reason the Legislature hereby occupies the subject matter of mandatory development fees and other development requirements for school facilities finance to the exclusion of all local measures on the subject.' . . ." (*Grupe Development Co.* v. *Superior Court, supra,* 4 Cal.4th at pp. 916-918, italics and fns. omitted.)

*Grupe* concluded section 65995 not only restricts development fees but also preempts all "special taxes," *except Mello-Roos taxes,* which are expressly removed from the statute's reach by section 65995, subdivision (f), quoted at footnote 4, *ante. (Grupe Development Co.* v. *Superior Court, supra,* 4 Cal.4th at p. 921 [as a matter of statutory construction, the express statutory exemption of only Mello-Roos taxes indicated other special taxes were not exempt].) The special taxes at issue in *Grupe* were not Mello-Roos taxes.

*Grupe* did not concern the 1992 legislation (Sen. Bill 1287) at issue in this appeal.[14]

Senate Bill 1287 was enacted at a time when Proposition 170 was being proposed. Proposition 170 would have allowed school facilities bond measures to be approved by a majority (rather than two-thirds) of the voters in local elections and would have allowed property taxes to exceed the current one percent limit in order to repay the bonds. (Assem. Const. Amend. 6 (1991-1992 Reg. Sess.); Ballot Pamp., Proposed Amends. to Cal. Const., Statewide Elec. (Nov. 2, 1993), Prop. 170, pp. 16-19, 40-41; see Stats. 1992, ch. 1354, §§ 2, 7, 10.)

Senate Bill 1287 provided that if the voters adopted Proposition 170, Education Code provisions authorizing state matching funds would be repealed effective January 1, 1996. (Stats. 1992, ch. 1354, §§ 1, 2, 10.) The stated intent was to implement a policy that primary financial responsibility should rest with school districts, but they should be authorized to raise sufficient revenues locally. (Stats. 1992, ch. 1354, §§ 1, 10.)

Since Senate Bill 1287 was already passed before Proposition 170 appeared on the ballot, the ballot pamphlet was able to convey to voters in definitive terms the effect of voting for the measure. Thus, the ballot pamphlet contained an analysis by the Legislative Analyst, which told voters: "The state . . . has provided a significant portion of the funding for [school] facilities, through the state schools facilities program. This program has been funded with $6.8 billion in state general obligation bonds approved by the voters since 1986. When all these bonds are sold, the state's debt service costs on these bonds will be about $600 million annually. Under existing law, passage of this measure would result in the repeal of most of the state school facilities program in 1996. [¶] . . . [U]nder existing law, the state's school facilities program would be greatly reduced should this measure pass." (Ballot Pamp., Proposed Amends. to Cal. Const., Statewide Elec. (Nov. 2, 1993) Prop. 170, p. 17.)

Senate Bill 1287 also made changes to the existing system and specified the changes would be repealed in the event Proposition 170 failed to receive the approval of the voters. Thus, Senate Bill 1287 enacted the statute at issue in this case—former section 65995.3, quoted at footnote 1, *ante*—which authorized school districts to levy an additional fee of $1 per square foot on residential projects. (Stats. 1992, ch. 1354, § 5.) This statute went into effect on January 1, 1993. (Cal. Const., art. IV, § 8, subd. (c) [effective date of

---

[14]We granted the district's request for judicial notice of legislative history of Senate Bill 1287—Senate Rules Committee Analysis and Senate Third Reading of Senate Bill 1287.

statutes].) As indicated, that authorization was repealed upon defeat of Proposition 170 in the November 1993 election.

Senate Bill 1287 made other changes that would be repealed upon the voters' rejection of Proposition 170. (Stats. 1992, ch. 1354, § 4, subd. (g), § 7, subd. (d).) Thus, Senate Bill 1287 amended section 65995, subdivision (a),[15] a provision which restricted development fees and requirements. The amendment specified that the restriction on the levying of fees and other requirements applied to action by the legislative body of a local agency "whether by administrative or legislative action." (Stats. 1992, ch. 1354, § 4.) This change abrogated case law holding sections 65995 and 65996 restricted only administrative action (such as tentative tract map approval or conditional use permits) and did not restrict local government's use of zoning and general plans to restrict development. (*Murrieta Valley Unified School Dist.* v. *County of Riverside* (1991) 228 Cal.App.3d 1212 [279 Cal.Rptr. 421]; *William S. Hart Union High School Dist.* v. *Regional Planning Com.* (1991) 226 Cal.App.3d 1612 [277 Cal.Rptr. 645]; *Mira Development Corp.* v. *City of San Diego* (1988) 205 Cal.App.3d 1201 [252 Cal.Rptr. 825]; Sen. Rules Com., Bill Analysis, SB 1287, Aug. 28, 1992, p. 3.)

Senate Bill 1287 also amended (subject to repeal upon defeat of Proposition 170) section 65996—a provision which placed restrictions on denial of approval for development projects. The amendments expressly made the provision applicable to both administrative and legislative action. (Former § 65996, subd. (a).)[16] Additionally, the amendments prohibited public agencies not only from denying approval of projects on the basis of adequacy of

[15]The Senate Bill 1287 version of section 65995, subdivision (a), which proved to be temporary, provided: "Except for a fee, charge, dedication, or other requirement authorized under Section 53080, or pursuant to Chapter 4.7 (commencing with Section 65970), no fee, charge, dedication, or other requirement shall be levied by the legislative body of a local agency against a development project, as defined in Section 53080, whether by administrative or legislative action, for the construction or reconstruction of school facilities." (Stats. 1992, ch. 1354, § 4.)

Senate Bill 1287 contained an alternate version of section 65995, without the specific reference to "administrative or legislative action," specifying it would go into effect upon defeat of Proposition 170. (Stats. 1992, ch. 1354, § 3.)

[16]The amended version of section 65996, subdivision (a), which proved to be temporary, provided: "The following provisions shall be the exclusive methods of mitigating environmental effects related to the adequacy of school facilities when considering the approval or the establishment of conditions for the approval of a development project by administrative or legislative action pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code [CEQA]: . . . [¶] (5) Section 53080 of the Government Code [school district levies against development projects]. [¶] (6) Chapter 2.5 (commencing with Section 53311) of Division 2 of Title 5 of the Government Code [Mello-Roos taxes]. . . ." (Stats. 1992, ch. 1354, § 7, subd. (a).)

school facilities, but also from "impos[ing] conditions on the approval of a project for the purpose of providing school facilities that exceed the amounts authorized pursuant to this chapter" (former § 65996(b)[17]). (Stats. 1992, ch. 1354, § 7.) The amendments also expanded the scope from action under the Subdivision Map Act to action under the planning and land use provision. (*Ibid.*; see fn. 17, *ante.*)

The Legislative Counsel's Digest for Senate Bill 1287 explained:

"Existing law prescribes the exclusive methods that may be required by local agencies to mitigate environmental effects related to the adequacy of school facilities when considering, under the California Environmental Quality Act ('CEQA'), the approval, or the establishment of conditions for the approval, of a development project . . . . Existing law also prohibits a public agency, under CEQA or the Subdivision Map Act, from denying approval of a project on the basis of the adequacy of school facilities. [¶] This bill would prohibit a public agency, in the exercise of its authority to adopt general plans, zoning laws, and other land use legislation, from either denying approval of a project on the basis of the adequacy of school facilities or imposing conditions, other than the requirement to pay the limited school facilities fees, on the approval of a project for the purpose of providing school facilities. [¶] The bill also would delete the definition of development project . . . and would specify that the restrictions described above upon the mitigation of environmental effects under CEQA apply to both administrative and legislative action taken by a public agency under CEQA. . . ." (Legis. Counsel's Dig., SB 1287, Stats. 1992, ch. 1354.)

With the foregoing statutory background in mind, we turn to the issues in this appeal.

### C. *Former Section 65996*

■ As indicated, the trial court entered judgment in favor of the developers only on their second cause of action, which alleged a violation of

---

A similar version went into effect upon defeat of Proposition 170; it deleted the reference to "administrative or legislative action." (Stats. 1992, ch. 1354, § 6.)

[17]The temporary version of section 65996(b), provided: "No public agency shall, pursuant to Division 13 (commencing with Section 21000) of the Public Resources Code [California Environmental Quality Act or CEQA] or Title 7 (commencing with Section 65000) [titled "Planning and Land Use"], deny approval of a project on the basis of the adequacy of school facilities, *or impose conditions on the approval of a project for the purpose of providing school facilities that exceed the amounts authorized pursuant to this chapter.*" (Stats. 1992, ch. 1354, § 7, subd. (b), italics added.)

Before Senate Bill 1287 and after defeat of Proposition 170, section 65996(b) omitted the italicized language and referred not to title 7 but to "Division 2 (commencing with Section 66410) [Subdivision Map Act]." (Stats. 1986, ch. 887, § 11, p. 3084; Stats. 1992, ch. 1354, § 6.)

former section 65996(b), quoted at footnote 3, *ante.* This cause of action alleged the "amount of the Additional Fee, when added to the amount of the special tax collected by CFD No. 1 over the life of the Mello Roos bonds issued by CFD No. 1 and reduced to a per square foot figure, will exceed the total aggregate amount authorized to be collected on a per square foot basis from residential development by [former section 65996(b)] (as it was codified at the time the fee was collected), in that such total aggregate amount of the Additional Fee and special tax levied by CFD No. 1 on new residential development will exceed Two Dollars and Sixty-Five Cents ($2.65) per square foot."

We will first consider whether former section 65996(b) applied to school districts. We will then consider whether former section 65996 excluded existing and/or future Mello-Roos taxes from the calculation of the maximum fees and requirements.

### 1. *Former Section 65996 Applied to School Districts*

The district argues former section 65996(b), quoted at footnote 3, *ante*, did not apply at all, because that statute applied only to "planning agencies," such as cities or counties, which have the power to approve projects. The district suggests relief was really granted to developers under former section 65995 (quoted at fn. 20, *post*), not 65996. The developers insist former section 65996 was their theory and argue former section 65996(b) on its face applied to any "public agency," which includes school districts. We shall conclude the statute applied to school districts.

Thus, former section 65996(b), quoted at footnote 3, *ante*, restricted agencies not only in denying approval of projects but also in "impos[ing] conditions on the approval of a project for the purpose of providing school facilities . . . ." A school district is empowered to impose conditions on the approval of projects for the purpose of providing school facilities. (§ 53080, subd. (a)[18] [authorizes school districts to levy fees against development projects for school facilities purposes]; § 53080, subd. (b)[19] [provides that payment of the school district's development fee will be a condition for approval of building permits].) Moreover, section 53080—which authorizes

---

[18]Section 53080, subdivision (a), provides in part: "(a)(1) The governing board of any school district is authorized to levy a fee, charge, dedication, or other requirement against any development project within the boundaries of the district, for the purpose of funding the construction or reconstruction of school facilities, subject to any limitations set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7. . . ."

[19]Section 53080, subdivision (b), provides: "No city or county, whether general law or chartered, may issue a building permit for any development absent certification by the appropriate school district of compliance by that development project with any fee, charge, dedication, or other requirement levied by the governing board of that school district pursuant

levy only by school districts—is expressly referenced in former section 65996, subdivision (a), quoted at footnote 16, *ante* (as one of the exclusive methods of mitigating environmental effects related to school facilities).

We recognize former section 65996(b), quoted at footnote 3, *ante*, referred to public agencies acting "pursuant to" the California Environmental Quality Act (CEQA) or "Title 7 (commencing with Section 65000)." However, although title 7 is titled "Planning and Land Use," it is not limited to actions of planning agencies, because title 7 includes both section 65995,[20] which the district concedes applies to school districts, and section 65996. Thus, the reference to title 7 does not mean the statute applies only to planning agencies. Indeed, section 65932, which is also part of title 7, broadly defines "public agency" as "any state agency, any county, city and county, city, regional agency, public district, redevelopment agency, or other political subdivision."

As to the statute's reference to CEQA, the district states it does not have powers to enforce CEQA. Nevertheless, former section 65996, subdivision (a), quoted at footnote 16, *ante*, specified that section 53080 (which authorizes school districts to levy development fees) was one of the exclusive methods of mitigating environmental effects under CEQA.

The district cites various cases for the supposed proposition that section 65996 has always applied only to planning agencies. (E.g., *Murrieta Valley*

to subdivision (a), or of the district's determination that the fee, charge, dedication, or other requirement does not apply to the development project."

[20]At the time in question, section 65995 provided in part: "(a) Except for a fee, charge, dedication, or other requirement authorized under Section 53080, or pursuant to Chapter 4.7 (commencing with Section 65970), no fee, charge, dedication, or other requirement shall be levied by the legislative body of a local agency against a development project, as defined in Section 53080, whether by administrative or legislative action, for the construction or reconstruction of school facilities.

"(b) In no event shall the amount of any fees, charges, dedications, or other requirements authorized under Section 53080, or pursuant to Chapter 4.7 (commencing with Section 65970), or both, exceed the following: [¶] (1) One dollar and fifty cents ($1.50) per square foot of assessable space, in the case of any residential development [increased every two years for inflation] . . . .

" . . . . . . . . . . . . . . . . . . . . . . . . .

"(e) The Legislature finds and declares that the subject of the financing of school facilities with development fees is a matter of statewide concern. For this reason the Legislature hereby occupies the subject matter of mandatory development fees and other development requirements for school facilities finance to the exclusion of all local measures on the subject.

"(f) Nothing in this section shall be interpreted to limit or prohibit the use of Chapter 2.5 (commencing with Section 53311) of Division 2 of Title 5 [Mello-Roos] to finance the construction or reconstruction of school facilities. . . ." (Stats. 1992, ch. 1354, § 4.)

As indicated, a similar version of section 65995 went into effect upon defeat of Proposition 170; it deleted from subdivision (a) the words "whether by administrative or legislative action." (Stats. 1992, ch. 1354, § 3.)

*Unified School Dist.* v. *County of Riverside, supra,* 228 Cal.App.3d at p. 1230.) However, the cited cases involved planning agencies; they did not consider or decide whether the statute also applied to nonplanning agencies. Moreover, the cited cases dealt with a different version of the statute, which placed restrictions only on denial of project approval, unlike the Senate Bill 1287 version, which added restrictions on imposing conditions on project approval.

The district cites the legislative history that Senate Bill 1287 was intended to expand the restrictions on planning agencies to include legislative as well as administrative action. The district believes that express intent forecloses any other consequence of the bill. We disagree. The pertinent version of section 65996(b) plainly encompassed school districts.

We conclude former section 65996(b) applied to school districts.

### 2. *Former Section 65996 Excluded All Mello-Roos Taxes*

The district contends the trial court erred in concluding the exemption of Mello-Roos taxes from the statutory restriction on development fees and requirements was for *future* Mello-Roos taxes only.[21] Consequently, argues the district, the developers were properly required to pay the $1 per square foot Senate Bill 1287 fee, even though that fee, together with the existing Mello-Roos taxes, exceeded the statutory cap on fees and other requirements. We agree with the district.

Former section 65996 provided that no public agency could "impose conditions on the approval of a project for the purpose of providing school facilities that exceed the amount authorized pursuant to this chapter." "This chapter" includes section 65995, which both before and after the defeat of Proposition 170 has provided: "Nothing in this section shall be interpreted to limit or prohibit the use of [Mello-Roos taxes] to finance the construction or reconstruction of school facilities." (§ 65995, subd. (f); Stats. 1992, ch. 1354, §§ 3-4; Stats. 1989, ch. 1209, § 25, pp. 4696-4698; Stats. 1986, ch. 887, § 11, pp. 3083-3084.)

---

[21]Though the developers on appeal urge this position that only *future* Mello-Roos taxes are exempt, they dispute that this was the basis for the trial court's decision. However, the developers are incorrect. The trial court determined: "The only reasonable interpretation of Legislative intent in this statutory scheme, enacted at the time of substantial withdrawal by the State from the previously existent school financing scheme, is that the Legislature was indicating *for the future* that public entities and property owners/developers could avoid the statutory limitations by the consent and election procedures necessary to Mello-Roos financing. There is nothing in the legislation to suggest that the Legislature intended that property owners/developers already burdened with Mello-Roos obligations were not to have the benefit of the otherwise applicable statutory limitation." (Original italics.)

■ We apply the established principles of statutory construction that "[i]f a statute's language is clear, then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." (*Kizer* v. *Hanna* (1989) 48 Cal.3d 1, 8 [255 Cal.Rptr. 412, 767 P.2d 679].) "The plain meaning of words in a statute may be disregarded only when that meaning is ' "repugnant to the general purview of the act," or for some other compelling reason . . . .' " (*DaFonte* v. *Up-Right, Inc.* (1992) 2 Cal.4th 593, 601 [7 Cal.Rptr.2d 238, 828 P.2d 140].)

■ Given the broad language used in section 65995, subdivision (f), that "[n]othing in this section shall be interpreted to limit or prohibit the use of" Mello-Roos taxes, we cannot see how this language can be construed as applying only to future Mello-Roos taxes. The statute on its face applies to all Mello-Roos taxes.

The developers would have us insert language into the statute so that it applies only to Mello-Roos taxes adopted after the development fees. However, ". . . if the Legislature had intended to so limit the statute's reach, it would have clearly said so." (*Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 219 [188 Cal.Rptr. 115, 655 P.2d 317].) ■ Courts may not rewrite statutes to supply omitted terms or to conform to an assumed, unexpressed legislative intent. (*Daley* v. *State Dept. of Social Welfare* (1969) 276 Cal.App.2d 801, 804 [81 Cal.Rptr. 318].) It is, of course, up to the Legislature, and not the courts, to rewrite statutes. (*In re Christian S.* (1994) 7 Cal.4th 768, 782 [30 Cal.Rptr.2d 33, 872 P.2d 574].)

■ A similar request that a court insert a restriction the Legislature allegedly overlooked was rejected in *Autoland, Inc.* v. *Superior Court* (1988) 205 Cal.App.3d 857 [252 Cal.Rptr. 662]. There, the Legislature amended Code of Civil Procedure section 170.6 to include "referees" as judicial officers who may be removed by peremptory challenge. The appellant argued unsuccessfully that the Legislature intended to add only juvenile court referees, not all referees. As the court said, "Even if the Legislature's omission of words restricting the statute to juvenile court referees were inadvertent, the statutory language must control, unless an absurd result would follow." (205 Cal.App.3d at p. 860.)

The developers argue Senate Bill 1287 established an *absolute* maximum on school mitigation that could be imposed by local government without further vote of the electorate, and this amount "was now required to include existing Mello-Roos taxes." Since the developers' reasoning eludes us, we quote from their brief:

"To accomplish this result, the limitation on local fees was made a part of § 65996, *not* § 65995. Prior to adoption of Senate Bill 1287, § 65995, subdivision (f) made it clear that Mello-Roos taxes were not subject to the limitations on school fees provided by that *section*. Under Senate Bill 1287, that exemption continued. As a result, there has never been any limitation on the amount of school fees that a district could pursue under a Mello-Roos [*sic*].

"Conversely, § 65996 identifies all forms of local school impact mitigation, including fees and Mello-Roos taxes, and limits the total mitigation to 'amounts authorized pursuant to [Chapter 4.9].' Chapter 4.9 authorized, during the life of Senate Bill 1287, school facilities fees in the amount of $2.65, but it did *not* authorize Mello-Roos taxes, which were authorized by the separate Mello-Roos provisions of Chapter 2.5 (§ 53311, *et seq.*)." (Original italics.)

The final quoted paragraph is baffling. The developers acknowledge former section 65996 limited total mitigation to amounts authorized in that chapter. The developers assert Mello-Roos taxes are authorized not by that chapter but by section 53311 et seq. The developers apparently conclude this somehow means the maximum amount of school mitigation "was now required to include existing Mello-Roos taxes."

However, although section 53311 et seq. are the statutes authorizing the formation of CFD's and adoption of Mello-Roos taxes, Mello-Roos taxes *are* "amounts authorized pursuant to [this chapter]" under section 65996, because section 65996, subdivision (a) (see fn. 16, *ante*), authorized and authorizes Mello-Roos taxes as one of the exclusive methods of school mitigation.

The developers maintain their interpretation of Senate Bill 1287 does not constitute an impermissible restriction on Mello-Roos taxes, because it "merely requires districts to consider the presence of existing Mello-Roos taxes in determining whether they can impose additional fees." Thus, in the developers' view, Senate Bill 1287 restricted only existing, not later-adopted Mello-Roos taxes. We have already explained why we believe the trial court was wrong in reaching that conclusion.

We discern in the foregoing quotation from the developers' brief an argument that section 65995, subdivision (f), (which was unchanged by SB 1287), merely means there is no limit to the amount of Mello-Roos taxes that can be assessed under the Mello-Roos statutes. In other words, voters could approve a CFD imposing Mello-Roos taxes in an amount without regard for the cap placed on districts imposing development fees. However, the developers' interpretation—whereby Mello-Roos taxes would have to be counted in calculating whether the cap on developers' fees was exceeded—would

lead to a violation of the Mello-Roos provisions, which specify "The provisions of this chapter shall not affect or limit any other provisions of law authorizing or providing for the furnishing of governmental facilities or services or the raising of revenue for these purposes."[22] (§ 53311.5) "Any provision in this chapter which conflicts with any other provision of law shall prevail over the other provision of law." (§ 53312.)

To construe section 65995 in the manner proposed by the developers would add language and meaning which is not there, and would contravene the mandate of the Mello-Roos statutes that Mello-Roos taxes not affect or limit other funding methods.

In *Grupe Development Co.* v. *Superior Court, supra,* 4 Cal.4th 911, a school district imposed a development fee, in the maximum amount authorized by statute, on property which was already subject to a voter-approved "special tax" (not a Mello-Roos tax) to fund new school construction. (*Id.* at pp. 914-915.) The developer paid both the fee and the tax in order to obtain building permits and then sought a refund of the special tax. (*Ibid.*) The Supreme Court determined the developer was entitled to a refund because section 65995 preempts all special taxes, *except Mello-Roos taxes.* In so holding, the court stated: "[I]t is particularly significant that subdivision (f) of section 65995 *expressly* excludes from the statute's reach the class of special taxes that may be levied pursuant to the Mello-Roos Community Facilities Act of 1982. If the Legislature had intended that subdivision (a) of section 65995 exclude *all* special taxes, it would not have expressly excluded *one* class of special taxes, i.e., Mello-Roos taxes, in the same statute. . . . From the fact that the Legislature specified one class of special taxes that is not subject to the limitations of section 65995, moreover, we may reasonably infer that it intended that all other classes of special taxes fall within the statute. . . ." (*Grupe, supra,* 4 Cal.4th at p. 921, original italics, fn. omitted.)

We conclude the trial court erred in determining the Mello-Roos taxes counted in calculating the statutory cap on development fees/requirements. We therefore need not address the district's further argument that the trial court's decision defeats the purpose of Proposition 13.

Reversal of the judgment is therefore required, unless the judgment may be affirmed on alternative grounds, as urged in the developers' cross-appeal. We turn now to the cross-appeal.

---

[22]Section 53311.5 further states Mello-Roos taxes provide an alternative method of financing. Here, the Mello-Roos taxes were intended as an alternative to Assembly Bill 2926 fees. They were not intended as an alternative to the subsequently enacted Senate Bill 1287 fee, as the trial court determined in rejecting the developers' contract claim. The parties do not challenge the trial court's resolution of the contract claim.

## III. *The Cross-appeal*

As indicated, the developers filed a protective cross-appeal, arguing that even if the judgment could not be sustained on the basis upon which the trial court ruled, the judgment could nevertheless be affirmed on alternative grounds because the trial court erred in rejecting the developers' other theories that (1) the fee was imposed without establishing the required nexus between the fee and the need created by the development, thereby constituting an unconstitutional special tax (first and fifth causes of action), and (2) the fee was procedurally defective for failure to give appropriate notice to the county (seventh cause of action). We shall conclude there is no merit to the cross-appeal.[23]

### A. *Required Nexus*

The developers argue the trial court erred in rejecting their first and fifth causes of action, both of which raised the question whether the district properly established the necessary nexus to impose its fee, thereby avoiding a determination that its fee was, in reality, an invalid special tax that had not been adopted by the requisite vote of the electorate. We find no merit in the developers' contention.

The first cause of action alleged violation of section 66001,[24] which requires that an agency make certain determinations regarding the need for the fee and reasonableness of the fee in relation to the need created by the development. The fifth cause of action alleged that because the fee violated

---

[23]The developers' notice of cross-appeal also designated a cross-appeal from adverse rulings on their other causes of action, but the developers' brief states they abandon those claims.

[24]Section 66001, subdivision (a), provides: "(a) In any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency on or after January 1, 1989, the local agency shall do all of the following:

"(1) Identify the purpose of the fee.

"(2) Identify the use to which the fee is to be put. If the use is financing public facilities, the facilities shall be identified. That identification may, but need not, be made by reference to a capital improvement plan as specified in Section 65403 or 66002, may be made in applicable general or specific plan requirements, or may be made in other public documents that identify the public facilities for which the fee is charged.

"(3) Determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed.

"(4) Determine how there is a reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed.

section 66001, it was really an invalid special tax passed without the two-thirds vote required under California Constitution, article XIII A.[25]

We shall conclude the district did not violate section 66001.

### 1. Standard of Review

■ "[A]ction imposing school facilities fees is quasi-legislative and reviewed under the narrower standards of ordinary mandate (Code Civ. Proc., § 1085). We determine only whether the action taken was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law. Such limited review is grounded on the doctrine of separation of powers which (1) sanctions the legislative delegation of authority to the agency and (2) acknowledges the presumed expertise of the agency. [Citation.] The inquiry into arbitrariness or capriciousness is like substantial evidence review in that both require a reasonable basis for the decision. [Citation.]" (*Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 328 [4 Cal.Rptr.2d 897], italics omitted.)

"In a mandamus proceeding, the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law. [Citations.] Trial and appellate courts therefore perform the same function and the trial court's statement of decision has no conclusive effect upon us. [Citation.]" (*Shapell Industries, Inc.* v. *Governing Board, supra,* 1 Cal.App.4th at p. 233.)

Where the contention raises a question of statutory construction, the issue is one of law, which we review de novo. (*Burden* v. *Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].)

### 2. Section 66001

■ The developers contend it is "obvious" the district failed to make the determinations required by section 66001, subdivision (a) (quoted

---

[25]California Constitution, article XIII A, section 4, provides in part: "Cities, Counties and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district . . . ."

at fn. 24, *ante*)—specifically a determination regarding reasonableness of the Senate Bill 1287 fee.[26] However, the following determinations appear in the resolution:

"1. Existing District school facilities cannot adequately house additional students in grades K-8 generated from new residential construction within the boundaries of the Dry Creek School District.

"2. District is financially incapable of providing new school facilities construction without additional funding. Funds provided pursuant to Chapter 1209, Statutes of 1989 (SB 2926) [*sic*]. Funds from existing agreements with developers are insufficient to meet school housing needs.

"3. Chapter 1354, Statutes of 1992 (SB 1287) provides an additional source of facilities construction funding.

"4. Based on the District Master Facilities Plan, Finance Plan, existing District-developer agreements and existing State Statutes authorizing school facilities construction fees, there are insufficient capital funds to pay for new construction to house the additional students to be generated from homes to be constructed with [*sic*] the District.

"In view of the uncertain effect of Chapter 1354, Statutes of 1992 (SB 1287) upon the availability of matching funds, it is imperative that the District act to add to its capital funds capacity in order to undertake new facilities construction to meet future student needs.

"5. Adoption of an additional fee under [Senate Bill 1287] is a ministerial action, not a 'project' [under CEQA] in that all physical construction of new school facilities to house additional students was reviewed, evaluated and already determined under the District's existing Facilities Master Plan and existing Finance Plan and related updates. The fee authorized by this resolution is an additional charge on new and remodeled residential construction to be appropriated to pay or partially pay for new school facilities previously identified in the District Master Facilities Plan, the environmental effects of which were evaluated and considered before adopting same; and this fee does not authorize or induce facilities construction not previously approved in the Master Facilities Plan."

---

[26]The developers claim more specific defects in their reply brief on the cross-appeal. We need not consider these new points raised in the reply brief (*Neighbours* v. *Buzz Oates Enterprises* (1990) 217 Cal.App.3d 325, 335, fn. 8 [265 Cal.Rptr. 788]), particularly since the developer's opening brief on the cross-appeal ignored the determinations that were made by the district, and since the developers concede the district's decision was not arbitrary or capricious on a district-wide basis.

Thus, under the unique circumstances of this case, the district was acting to compensate for an anticipated loss of funding for needs previously determined.

The analysis of the district's action in adopting the fee looks to the state of affairs known or anticipated at the time the district acted. (See, e.g., *Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at pp. 233, 235.) Thus, the subsequent defeat of Proposition 170 does not detract from the validity of the district's action at the time it passed the resolution adopting the Senate Bill 1287 fee, nor do the developers so argue.[27]

The developers concede the Senate Bill 1287 fee was not arbitrary or capricious on a district-wide level. Instead, the developers contend the determinations of nexus made by the district were inadequate because, when the district imposed the Senate Bill 1287 fee in the Antelope area, it was required to give credit to preexisting Mello-Roos funding and to determine, within the confines of CFD No. 1, if there existed a proper nexus to support the additional fee. Developers assert this is a question of first impression— whether the district, which has separate funding areas (see fn. 7, *ante*), must assess the reasonable nexus questions on an area-wide, rather than district-wide basis. The developers acknowledge case law holding school districts have authority to impose fees on a district-wide basis. (*Garrick Development Co.* v. *Hayward Unified School Dist., supra*, 3 Cal.App.4th at pp. 335-336 [site-specific determinations not required]; *Shapell Industries, Inc.* v. *Governing Board, supra*, 1 Cal.App.4th at p. 234.) The developers argue these cases are distinguishable because they did not involve a school district divided into different funding areas, where one area provided for the entire cost of school needs through Mello-Roos taxes. The developers also quote from *Shapell:* " '[T]o impose the burden on one property owner to an extent beyond his [or her] own use shifts the government's burden unfairly to a private party . . . .' [Citation.] It follows that facilities fees are justified only to the extent that they are limited to the cost of increased services made necessary by virtue of the development." (*Id.* at pp. 234-235; but see *Garrick, supra*, 3 Cal.App.4th at p. 335 [it is not required that nexus be found between fee and particular projects].)

However, assuming for the sake of argument that an area-wide analysis is appropriate, in this case all areas of the district were in the same position. Thus, all areas of the district were subject to fees and/or taxes which were

---

[27]The developers do not challenge the validity of the legislation itself, authorizing imposition of the fee before the vote on Proposition 170 which would decide the fate of state matching funds.

designed to provide up to 50 percent of the cost of school facilities, with the district looking to the state for the other 50 percent. The need for school facilities created by development had previously been documented in the district's master facilities plan, as referenced in Resolution No. 1993-4. When the district adopted the Senate Bill 1287 fee, an elimination of state funds was threatened, which would affect all areas of the district. The developers do not contend the $1 per square foot fee authorized by Senate Bill 1287 exceeded the anticipated loss of state funding.

The developers' insistence on the need for an area-wide assessment is based on their claim that the Mello-Roos taxes "fully satisfied" the need for school facilities arising from development in CFD No. 1, such that the fee imposed an unfair burden on the Antelope area. They repeatedly assert the Mello-Roos taxes were to provide the "entire cost of all new school facilities necessitated by new residential development" in the Antelope area, and the cost of increased services made necessary by residential development in CFD No. 1 was already "fully satisfied by the Mello-Roos special tax."

However, the trial court found to the contrary, stating: "Plaintiffs' contentions that the Board was bound to conclude that facilities needs were wholly met by prospective Mello-Roos funding persistently ignores the reality that said funding mechanism was adopted in direct relationship to a 50% State contribution to construction which appeared to have evaporated . . . ."

Substantial evidence supports the trial court's finding that the Mello-Roos taxes were intended to fund only half the cost of school facilities needs. Thus, a supervising deputy county counsel, who was involved in the negotiation of the school financing settlement agreement which called for creation of the Mello-Roos district, testified to "the anticipation that [the Mello-Roos tax] would be . . . in an amount sufficient to build the necessary schools under a 50/50 match program with the State." The settlement agreement stated "the only reliable method of obtaining sufficient State funding is for the School District to generate the funds necessary to match State funds on up to a 50/50 basis . . . ." Additionally, among the declarations submitted by the developers was the declaration of an attorney who represented some of the developers in negotiating the school financing settlement agreement. The attorney attested the developers negotiated with the district and the county "in order to form a Mello Roos Community Facilities District to provide the necessary funding mechanism to pay for the DISTRICT's 50% share of school financing."

Moreover, the developers concede that the Mello-Roos taxes were intended to fund only 50 percent of the cost of school facilities. Thus, in their

reply brief on the cross-appeal, the developers state: "District argues forcefully that the Antelope Mello Roos tax was intended to fund the local 50% share of school funding. . . . *However correct*, the argument ignores the fact that the Mello Roos tax was designed, if necessary, to fully fund school facility needs in Antelope. The Mello Roos authorized $30,000,000 in bonds to pay for Antelope school facilities, far in excess of the total need for approximately $24,000,000 in funding for all Antelope facilities, which also served other areas of the District." (Italics added.)

Thus, the developers concede the Mello-Roos taxes were intended to fund only half the costs.

As to the developers' argument that CFD No. 1 had the *capacity* to exact Mello-Roos taxes in an amount greater than the intended 50 percent of school facilities costs, the trial court said the developers' argument "ignores the reality that the Board need not limit itself in analysis to a preexistent $30 million bond authorization. Certainly such authorization is a factor of financing flexibility that the Board must (and did) consider; but it was free also to recognize that ultimate issuance requires further funding analysis regarding other available funds and the receptiveness of the bond market."

This determination finds support in the record, and the developers fail to show any reversible error in the trial court's analysis. Thus, the district's Mello-Roos financing plan for CFD No. 1, dated November 1988, reiterated the 50 percent match and stated the district intended to establish the bonding authorization and special tax rates at a level that would pay for the district's share of costs. The financing plan also noted it was expected the tax levied would be less than the maximum tax that could be levied by CFD No. 1. The financing plan further stated the tax rate would be established annually, upon determination of factors such as amounts necessary to pay current scheduled debt service on outstanding bonds, and revenues received from other sources may be subtracted from the annual tax requirement.

Thus, nothing required the district to levy Mello-Roos taxes to the maximum rather than impose the Senate Bill 1287 fee. To the extent the developers so argue, their position is unsympathetic because it would not reduce the Antelope area's burden but merely defer that burden from the developers (who pay the Senate Bill 1287 fee up front) to the ultimate homeowners (who bear the burden of Mello-Roos taxes).

In connection with their claim that Mello-Roos taxes could fully fund the school needs, the developers assert, without amplification, that their own expert "identified significant flaws" in the district's calculations. The developers also claim a district expert admitted the district's estimate (of a $36

million unfunded shortfall) was overstated by $13 million. The developers cite no evidence in the record to support this claim, in violation of California Rules of Court, rule 15(a). They cite only the trial court's decision, in which the court said a district expert conceded "certain funding sources (exclusive of the potential Mello-Roos overall funding) were not accurately stated." However, the trial court determined the mistake was without consequence and noted the developers agreed the district made every effort to be fair given the information at hand. Assuming for the sake of argument a miscalculation of $13 million, the developers fail to demonstrate any grounds for reversal of the trial court's determination that the miscalculation was without consequence, particularly in light of the magnitude of the unfunded shortfall.

We conclude the developers fail to show any reversible error in the trial court's rejection of the developers' claim that the district violated section 66001. The developers' opening brief on the cross-appeal offers no separate analysis on the question of invalid special tax, and we therefore need not separately consider it.

B. *Section 53080.1 Notice*

The developers argue the trial court erred in rejecting the claim in their seventh cause of action that the district was prohibited from collecting the fee due to its failure to give appropriate notice to the county, as required by section 53080.1, subdivision (c) (hereafter section 53080.1(c)).[28] We disagree.

Section 53080.1(c) requires the school district to transmit a copy of the resolution, supporting documentation, and a map to the county.

Here, the district merely informed the county of adoption of the fee in correspondence stating the documents were available upon request.

The trial court in its tentative decision determined the district's noncompliance with the notice requirement did not compel invalidation of the Senate Bill 1287 fee, and the developers had failed to show that the noncompliance had any impact on them.

The developers argue the district had a mandatory duty to give the proper notice to the county, and failure to comply with this duty renders the district's imposition of the Senate Bill 1287 fee invalid. We disagree.

---

[28]Section 53080.1(c) provides in part: "Upon adopting or increasing a fee, charge, dedication, or other requirement pursuant to subdivision (a) or (b), the school district shall transmit a copy of the resolution to each city and each county in which the district is situated, accompanied by all relevant supporting documentation and a map clearly indicating the boundaries of the area subject to the fee, charge, dedication, or other requirement. . . ."

 "Traditionally, the question of whether a public official's failure to comply with a statutory procedure should have the effect of invalidating a subsequent governmental action has been characterized as a question of whether the statute should be accorded 'mandatory' or 'directory' effect. If the failure is determined to have an invalidating effect, the statute is said to be mandatory; if the failure is determined not to invalidate subsequent action, the statute is said to be directory. . . . [I]n evaluating whether a provision is to be accorded mandatory or directory effect, courts look to the purpose of the procedural requirement to determine whether invalidation is necessary to promote the statutory design." (*People* v. *McGee* (1977) 19 Cal.3d 948, 958 [140 Cal.Rptr. 657, 568 P.2d 382], citing *Morris* v. *County of Marin* (1977) 18 Cal.3d 901 [136 Cal.Rptr. 251, 559 P.2d 606].) "[S]ome statutory procedures which are obligatory in nature, i.e., which a governmental entity is required to follow, are still accorded only directory effect, in that the failure to comply with such procedures does not invalidate subsequent actions." (*McGee, supra,* 19 Cal.3d at p. 961 [statutory requirement that restitution be sought before bringing criminal action for welfare fraud was intended to provide protection for individuals and therefore had mandatory effect].) "For example, while a governmental entity has an obligatory duty to observe the provisions of California's 'open meeting' law [citation], and can be enjoined from violating or mandated to follow such provisions [citation], California decisions to date have uniformly construed such provisions as having 'directory' effect, and thus have refused to invalidate governmental acts, such as the promulgation of an administrative regulation, even when the governmental entity improperly discussed the matter at a nonpublic meeting. [Citations.]" (*Morris, supra,* 18 Cal.3d at pp. 908-909, fn. 4 [county could be liable for injuries resulting from failure to discharge mandatory duty to insure that applicants for building permits carry workers' compensation insurance].)

 The developers contend the procedure in this case was intended for the protection of citizens and therefore should be accorded mandatory, not directory, effect, and the district's imposition of the Senate Bill 1287 fee should be held invalid.

 However, "[i]n construing [the term 'shall' in a] statute, the court must ascertain the legislative intent. ' "In the absence of express language, the intent must be gathered from the terms of the statute construed as a whole, from the nature and character of the act to be done, and from the consequences which would follow the doing or failure to do the particular act at the required time. [Citation.] When the object is to subserve some public purpose, the provision may be held directory or mandatory as will

best accomplish that purpose [citation]. . . .” . . .’ ” (*California Correctional Peace Officers Assn.* v. *State Personnel Bd.* (*CCPOA*) (1995) 10 Cal.4th 1133, 1143 [43 Cal.Rptr.2d 693, 899 P.2d 79]; see also *Conservatorship of James M.* (1994) 30 Cal.App.4th 293, 298 [35 Cal.Rptr.2d 567] [omission of penalty in statute suggests it is directory].)

Although *CCPOA* and *Conservatorship of James M.* involved the effect of noncompliance with time limitations, we do not believe the principle is limited to that type of noncompliance, as the developers suggest.

Additionally, provisions enacted to secure the orderly conduct of business (as opposed to provisions enacted for the benefit of the individual) are directory. (*Ryan* v. *Byram* (1935) 4 Cal.2d 596, 603 [51 P.2d 872]; see also *Skelly Estate Co.* v. *San Francisco* (1937) 9 Cal.2d 28, 33 [69 P.2d 171].)

Here, the only effect of noncompliance indicated in the statutes is that the county may be excused from any obligations regarding the fee. Thus, section 53080, subdivision (b), provides that no county may issue a building permit absent certification that the fee has been paid or waived. However, section 53080, subdivision (d), provides that subdivision (b) will not apply to a county “except upon the receipt by that . . . county of notification of the adoption of . . . the fee . . . in accordance with subdivision (c) of Section 53080.1.”

Here, the county received notice, though not the supporting documents. The county apparently was not troubled by the absence of supporting documentation and proceeded to require from developers certification that the fee was paid before permits would be issued.

It appears to us the notice requirement secures the orderly conduct of business. The developers posit no reason why the notice requirement to the county should be construed as designed to benefit the individual. Contrary to the developers’ claim, it does not follow that since the district seeks to require developers to pay the fee, the notice requirement must be designed to benefit the developers.

The developers maintain the district’s failure to give the proper notice to the county somehow prevented them from making a broad-based attack on the fee under the 120-day statute of limitations. However, the developers fail to show why or how the district’s noncompliance in failing to send along supporting documents to the county precluded the developers from filing an earlier action. Moreover, we have held in this opinion that the validity of the resolution itself could be attacked in a protest action.

Under these circumstances, the developers fail to persuade us that they should be entitled to a refund based on the district's failure to accompany the notice to the county with copies of the supporting documents and map.

## DISPOSITION

The judgment is reversed. The district shall recover its costs on appeal and cross-appeal.

Puglia, P. J., and Raye, J., concurred.