[No. G027494. Fourth Dist., Div. Three. Aug. 30, 2002.]

WARMINGTON OLD TOWN ASSOCIATES, L.P., Plaintiff and Respondent, v.
TUSTIN UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

## COUNSEL

Bowie, Arneson, Wiles & Giannone, Wendy H. Wiles, Leonie Mulvihill and Tiffany J. Israel for Defendant and Appellant.

Palmieri, Tyler, Wiener, Wilhelm & Waldron, Don Fisher and Paul B. La Scala for Plaintiff and Respondent.

## OPINION

**MOORE, J.**—In this case of first impression, we decide whether redevelopment construction is exempt from the imposition of school-impact fees under Education Code section 17620, subdivision (a)(1)(C)(i). The statutory provision does not expressly address redevelopment construction. However, the legislative history and the statutory exemptions given other types of construction under Education Code sections 17620, subdivision (a)(1)(A), and 17626 convince us the Legislature did not mean to provide an exemption for redevelopment construction.

Nonetheless, Government Code section 66001, subdivision (a)(3) and (4) requires that a school district's governing board, in imposing school-impact fees on redevelopment construction, must establish a reasonable relationship between the fee's use and the need for the public facility, on the one hand, and on the other hand, the type of development project, i.e., the demolition and replacement of housing units. In the case before us, the school district's governing board exercised its authority under Education Code section 17620 to impose school-impact fees on a redevelopment project, but failed to comply with the requirements of Government Code section 66001 in so doing. We affirm in part, reverse in part and remand.

## I

### FACTS

As part of a redevelopment project, Warmington Old Town Associates, L.P., a California limited partnership (Warmington), demolished 56 apartment units in the City of Tustin and replaced them with 38 single family homes (the Redevelopment Project). The Tustin Unified School District (the School District) then imposed $122,080.22 in school-impact fees on the Redevelopment Project, viewing the total square footage of the 38 single family homes as "new residential construction" within the meaning of Education Code section 17620, subdivision (a)(1)(B).

Warmington paid the entire sum under protest. It then filed a petition for a writ of mandate and declaratory relief requesting that the School District be directed to refund the fees paid. Warmington complained it should have received a "credit" with respect to the 56 units that were replaced and also argued there was an insufficient "nexus between the impact of the new residential units in terms of student generation and the facility fees" imposed.

In response, the School District filed a demurrer, asserting there was no legal authority to support Warmington's argument it was entitled to a credit for demolished units. It maintained the 38 newly constructed single family homes could only be construed as "new residential construction" within the meaning of Education Code section 17620, subdivision (a)(1)(B), and it was entitled to levy the fees under that provision. The court sustained the demurrer with leave to amend.

Thereafter, Warmington filed an amended petition for a writ of mandate and declaratory relief. Among other things, it stated the total number of dwelling units had been reduced by 18 and there would be a corresponding decrease in the number of students attending school within the School District. Warmington argued Education Code section 17620 did not permit the imposition of fees in this context. It also asserted the fees were imposed in violation of Government Code section 66001, subdivision (a)(3) and (4).

In its opposition to the first amended petition, the School District reiterated its arguments on the correct interpretation of Education Code section 17620 and also argued that a July 1998 Developer Fee Justification and Impact Analysis (Fee Study), undertaken before the fees were imposed, demonstrated the nexus Warmington claimed was lacking.

The court granted the petition in part. In its minute order dated December 9, 1999, the court construed Education Code section 17620, subdivision

(a)(1) as distinguishing between "new construction" and additions of more than 500 square feet to existing residences. It found new construction of 19,912 square feet and approved school fees to the extent of the additional square footage only.

In its formal order dated January 21, 2000, the court found the total square footage of the 56 apartment units had been 47,500 and the total square footage of the 38 new single family homes was 63,254. It held the School District was "only authorized to impose school fees on the Redevelopment Project on the resulting increase in assessable space in excess of 500 square feet." Because the increase in square footage was 15,754 square feet, school fees could be imposed on only 15,254 square feet (15,754 square feet minus 500 square feet). School fees were chargeable at the rate of $1.93 per square foot. The court concluded the School District, having imposed school fees with respect to 63,254 square feet instead of 15,254 square feet, had overcharged Warmington by $92,640. The court ordered a refund in that amount, plus interest at the rate of 10 percent per annum.

II

DISCUSSION

A. *Preliminary Considerations*

■ The School District challenges the formal order filed on January 21, 2000. The notice of appeal was filed on June 16, 2000. This court questioned whether the order is an appealable order and whether the notice of appeal was timely filed, and requested supplemental briefing to address these issues.

Code of Civil Procedure section 904.1, subdivision (a)(2) provides an appeal may be taken from an order entered after judgment. In this case, however, no judgment has been entered. Nonetheless, in their supplemental briefing, the parties agree the January 21, 2000 order is appealable. (See *Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 697-699 [107 Cal.Rptr.2d 149, 23 P.3d 43] [order denying petition for writ of administrative mandate deemed an appealable judgment]; *Haight v. City of San Diego* (1991) 228 Cal.App.3d 413, 416, fn. 3 [278 Cal.Rptr. 334] [appeal proper even though no formal judgment entered on order denying petition for writ of mandate].)

It is the substance and effect of the adjudication, not its form, which determines whether it is final and appealable. (*Griset v. Fair Political*

*Practices Com., supra,* 25 Cal.4th at p. 698.) " 'As a general test, which must be adapted to the particular circumstances of the individual case, it may be said that where no issue is left for future consideration except the fact of compliance or noncompliance with the terms of the first decree, that decree is final, but where anything further in the nature of judicial action on the part of the court is essential to a final determination of the rights of the parties, the decree is interlocutory.' [Citations.]" (*Id.* at pp. 698-699.) In this case, the parties agree no further judicial action is required to determine the rights of the parties. Thus, the appeal is properly taken.

■ We turn next to the issue of the timeliness of the appeal. The formal order was filed January 21, 2000. The trial court records are unclear as to when and upon whom notice of that order was served. A minute order dated July 14, 2000[1] states: "Notation in the Court's Order Log: Proposed Order on Motion For Writ of Mandate received 1-7-00; Date Signed: 1-21-00; Date Returned: Mailed 1-21-00 however original is not in file and input in Court's computer of said document on the register of action has not occurred."

The concern is with the indication the court may have served a copy of the signed order on January 21, 2000, when the notice of appeal was not filed until five months later. California Rules of Court, rule 2(a), as in effect in the year 2000, provided a notice of appeal had to "be filed on or before the earliest of the following dates: (1) 60 days after the date of mailing by the clerk of the court of a document entitled 'notice of entry' of judgment; (2) 60 days after the date of service of a document entitled 'notice of entry' of judgment by any party upon the party filing the notice of appeal, or by the party filing the notice of appeal; or (3) 180 days after the date of entry of the judgment." It further provided that "a file-stamped copy of the judgment [could] be used in place of the document entitled 'notice of entry'." Under the rule then in effect, the term "judgment" was defined to include an appealable order. (Former Cal. Rules of Court, rule 2(d), repealed eff. Jan. 1, 2002.) So, if the clerk had mailed the School District a file-stamped copy of the order on January 21, 2000, the appeal would be untimely filed. Indeed, Warmington takes the position the July 14, 2000 minute order proves such mailing and the appeal is therefore untimely.

However, the minute order shows the order log and the register of action are in conflict as to whether the clerk effectuated service. The order log indicates the formal order was signed and mailed on January 21, 2000, but

---

[1]The School District has requested that we take judicial notice of the July 14, 2000 minute order and an additional minute order dated July 11, 2000. We grant the School District's request. (Evid. Code, § 452, subd. (d).)

the register of action reflects that no such action was taken. At best, we have an indication that a copy of the order was served, but there is no indication of whether all parties were served, or only the prevailing party.

The School District has provided the declaration of Attorney Tiffany J. Israel to the effect she has scoured the files of both the superior court and her own office, which represents the School District, and found no proof of service or other evidence of service of the January 21, 2000 order on the School District prior to April 19, 2000. That was the date on which Warmington served the School District with a copy of the order. Inasmuch as the only indicia of service on the School District in advance of April 19, 2000, is a trial court log directly contradicted by the register of action, the School District has filed a declaration to the effect there is no evidence to show service on it by the clerk, and Warmington having provided no evidence at all, we resolve the doubt in favor of the School District. The appeal will be deemed timely filed under California Rules of Court, rule 2(a)(2).

This is consistent with the " 'well-established policy, based upon the remedial character of the right of appeal, of according that right in doubtful cases "when such can be accomplished without doing violence to applicable rules." ' [Citations.]" (*Montgomery Ward & Co. v. Imperial Casualty & Indemnity Co.* (2000) 81 Cal.App.4th 356, 372-373 [97 Cal.Rptr.2d 44] [holding appeal timely when it appeared more likely than not the clerk had mailed a copy of the file-stamped judgment to all parties, but the record contained no definitive evidence that this had been done].)

B. *Issues Framed and Standard of Review*

On appeal, the School District makes two primary arguments: (1) the trial court erred in its interpretation of Education Code section 17620 as a matter of law; and (2) the Fee Study showed that the school-impact fees imposed were reasonably related to the School District's need for educational facilities and provided the required nexus between the fees and the School District's needs.

■ The first issue, concerning the interpretation of Education Code section 17620, is a question of statutory construction. As to that, we conduct a de novo review. (*Western/California, Ltd. v. Dry Creek Joint Elementary School Dist.* (1996) 50 Cal.App.4th 1461, 1479 [58 Cal.Rptr.2d 220].) (4) The second issue, having to do with whether the School District adhered to the requirements of Government Code section 66001, subdivision (a)(3) and (4) in the imposition of school-impact fees, involves the quasi-legislative action of the School District. (*Western/California, Ltd. v. Dry Creek Joint Elementary School Dist., supra,* 50 Cal.App.4th at pp. 1491-1492; *Garrick*

*Development Co. v. Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 327-328 [4 Cal.Rptr.2d 897].) In review of this matter, "[w]e determine only whether the action taken was arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law." (*Garrick Development Co. v. Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 328.) "The inquiry into arbitrariness or capriciousness is like substantial evidence review in that both require a *reasonable basis* for the decision. [Citation.]" (*Ibid.*)

### C. *Education Code section 17620*

Education Code section 17620, subdivision (a) permits the governing board of any school district "to levy a fee . . . against any construction within the boundaries of the district, for the purpose of funding the construction or reconstruction of school facilities, subject to any limitations set forth in Chapter 4.9 (commencing with Section 65995) of Division 1 of Title 7 of the Government Code. . . ." Government Code section 65995, subdivision (b)(1) limits the amount of the fee that may be imposed under Education Code section 17620 to $1.93 per square foot of assessable space with respect to residential construction. Government Code section 65995, subdivision (d) defines the term "construction" to mean "new construction and reconstruction of existing building . . . ." The question before us is whether the fee may be properly applied to the type of construction at issue—redevelopment construction.

Education Code section 17620, subdivision (a)(1) provides the fee may be applied only: "(A) To new commercial and industrial construction. The chargeable covered and enclosed space of commercial or industrial construction shall not be deemed to include the square footage of any structure existing on the site of that construction as of the date the first building permit is issued for any portion of that construction. [¶] (B) To new residential construction. [¶] (C)(i) . . . [T]o other residential construction, only if the resulting increase in assessable space exceeds 500 square feet. The calculation of the 'resulting increase in assessable space' for this purpose shall reflect any decrease in assessable space in the same residential structure that also results from that construction. Where authorized under this paragraph, the fee . . . is applicable to the total resulting increase in assessable space. . . ."

The parties dispute whether redevelopment is properly classified as "new residential construction" to which fees may be applied under Education Code section 17620, subdivision (a)(1)(B) or "other residential construction"

to which fees may be applied under Education Code section 17620, subdivision (a)(1)(C)(i) "only if the resulting increase in assessable space exceeds 500 square feet."

In construing this statute, we must " 'ascertain the intent of the Legislature so as to effectuate the purpose of the law. In determining such intent, a court must look first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence in pursuance of the legislative purpose. A construction making some words surplusage is to be avoided. The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]' [Citation.]" (*Loyola Marymount University v. Los Angeles Unified School Dist.* (1996) 45 Cal.App.4th 1256, 1261 [53 Cal.Rptr.2d 424].)

(1) *Wording of the statute: "new" versus "other" residential construction*

In our first step, examining the words of Education Code section 17620, subdivision (a)(1) in the context before us, we find only ambiguity. The provision does not mention a word about "redevelopment" construction. Rather, subparagraph (B) thereof applies to "new" residential construction, whereas subparagraph (C) thereof applies to "other" residential construction. "Other" residential construction is not defined.

But as Warmington points out, all construction, whether from the ground up or in the form of add-ons or reconstruction, is by definition new. The bricks and mortar and other building materials used for the reconstruction project are generally new, whether the building is being built where there was never one before, or whether it is being built in place of, or as reconstruction of or remodel of, an existing building. Thus, the Legislature, in using the word "new" in Education Code section 17620, subdivision (a)(1)(B), may have meant to modify the term "residential," not the term "construction." So, instead of meaning "new . . . *construction,*" in the sense of having been constructed with new materials, the Legislature may have meant "new *residential* construction," in the sense of no *residential* units having existed there previously. For example, houses built on vacant lots, or built in place of commercial or industrial buildings, would be "new *residential* construction," there having been no residential buildings in that location previously. To interpret it differently, Warmington says, would render the

phrase "other residential construction" as used in Education Code section 17620, subdivision (a)(1)(C)(i) meaningless, since all construction is necessarily new.

(2) *Legislative history*

(a) *Purpose of the statute*

Warmington also argues its interpretation would further the intention of the Legislature. Former Government Code section 53080, the predecessor to Education Code section 17620, was enacted in 1986, as part of Assembly Bill No. 2926. (Assem. Bill No. 2926 (1985-1986 Reg. Sess.) § 8; *Grupe Development Co. v. Superior Court* (1993) 4 Cal.4th 911, 917-918 [16 Cal.Rptr.2d 226, 844 P.2d 545].) "Dispelling any doubt as to its intent, the Legislature declared in the subject bill that in many parts of California real property development was causing serious overcrowding in schools that traditional public financing was inadequate to relieve, and 'For these reasons, a comprehensive school facilities finance program based upon a partnership of state and local governments and the private sector is required to ensure the availability of school facilities to serve the population growth generated by new development.' (Stats. 1986, ch. 887, § 7, subd. (d), p. 3080.)" (*Grupe Development Co. v. Superior Court, supra,* 4 Cal.4th at pp. 917-918.) Thus, Warmington concludes, the Legislature was concerned with the extent to which the development generates new student population growth.

As Warmington sees it, the Legislature directly addressed this concern in Education Code section 17620, subdivision (a)(1)(C)(i). That provision permits the imposition of fees on "other residential construction, only if the resulting increase in assessable space exceeds 500 square feet." The Legislature clearly intended to give credit for existing structures. Otherwise, it would not have spoken of *increases* in assessable space. But did it intend to give credit in the context before us? Did it intend to give credit any time existing residential housing was either expanded or replaced with new housing?

(b) *Exemption for remodeling projects*

To answer this question, the School District offers an extensive legislative history on Education Code section 17620. As the School District contends, the legislative history tends to show the subdivision (a)(1)(C)(i) reference to "other residential construction" was intended to refer to residential remodeling projects, not to total demolition and replacement.

The version of former Government Code section 53080 contained in Assembly Bill No. 2926 provided for the imposition of a fee "against any development project . . . for new construction within the boundaries of the [school] district . . . ." (Assem. Bill No. 2926 (1985-1986 Reg. Sess.) § 8.) It made no qualification as to whether the construction was commercial, industrial, residential, new, or "other," tending to indicate the fee could be imposed on any type of new construction at all. But Senate Bill No. 2068, which became effective the same date as Assembly Bill No. 2926, amended former Government Code section 53080 to provide that the fee could "be applied only to new commercial and industrial construction, and, as to residential development, to new construction, and other construction to the extent of the resulting increase in habitable area." (Sen. Bill No. 2068 (1985-1986 Reg. Sess.) § 6.)

At least two documents in the legislative history show the Senate Bill No. 2068 language regarding increased habitable area was intended to refer to remodeling projects. Page 1 of the Senate Rules Committee, Office of Senate Floor Analyses, Unfinished Business Analysis of Senate Bill No. 2068 (1985-1986 Reg. Sess.), as amended August 29, 1986, clarified that the "residential fee only applie[d] when the construction produce[d] new habitable space (e.g., not kitchen remodel if no new space [was] added)." In addition, the legislative bill file of the Senate Committee on Education contains an analysis explaining that Senate Bill No. 2068 would modify the Assembly Bill No. 2926 terminology so that the "[r]esidential construction [against which developer fees could be levied] would be new or remodeling which results in increasing habitable area." In other words, the intention was to permit the application of a fee either to new residential construction or to residential remodeling resulting in increased space.

Assembly Bill No. 2926 and Senate Bill No. 2068 were not the final word on former Government Code section 53080, however. That statute was further amended in pertinent respects in 1989, pursuant to Assembly Bill No. 181. (Assem. Bill No. 181 (1989-1990 Reg. Sess.) § 19.) Upon amendment, former Government Code section 53080, subdivision (a)(1)(C) came to read substantially the way Education Code section 17620, subdivision (a)(1)(C)(i) does presently. It permitted fees to be imposed on "other residential construction, only if the resulting increase in assessable space, . . . exceeds 500 square feet. . . ." (Assem. Bill No. 181 (1989-1990 Reg. Sess.) § 19.)

The significance of this language was elucidated in the September 21, 1989 Enrolled Bill Report prepared by the Department of Finance on Assembly Bill No. 181 (1989-1990 Reg. Sess.) as amended September 13,

1989. Page 6 of the report stated the relevant provision of Assembly Bill No. 181 "would authorize school districts to impose developer fees on residential structure remodels, only if the resulting increase in assessable space exceeds 500 square feet." Page 3 of the report explained in greater detail: "This provision would authorize a school district to impose a developer fee on residential construction, other than new construction (i.e. remodels of existing residential homes), only if the resulting increase in assessable space, as defined, exceeds 500 square feet. [The Department of Finance] has no concerns with this provision because it authorizes a reasonable increased square footage allowance for remodels, and would discourage homeowners from not applying for a building permit to avoid paying a developer fee." This would tend to show the Assembly Bill No. 181 amendment was intended to encourage individual homeowners interested in remodeling their homes to seek building permits without fear of being subjected to the school-impact fees imposed on developers.

Further support for this interpretation is found in the 1989 Legislative Summary by the Assembly Committee on Education pertaining to Assembly Bill No. 181 (1989-1990 Reg. Sess.). Page 4 of that summary described Assembly Bill No. 181 as limiting or exempting "fees on residential *additions* . . . ." (Italics added.) We give this summary, prepared shortly after the bill was signed by the Governor, due deference, yet recognize that it is only a post hoc expression of the opinion of the Assembly Committee on Education as to what the Legislature meant when it adopted former Government Code section 53080. (*Grupe Development Co. v. Superior Court, supra,* 4 Cal.4th at p. 922 [opinion issued after adoption of statute obviously not considered by Legislature before passing bill].) Nonetheless, we find the summary to be persuasive, inasmuch as it is consistent with the Department of Finance September 21, 1989 Enrolled Bill Report.

Moreover, to interpret the legislative history as showing that current Education Code section 17620, subdivision (a)(1)(C)(i) was directed at remodeling projects is consistent with a critical reading of the language of that provision itself. Subdivision (a)(1)(C)(i) provides that "[t]he calculation of the 'resulting increase in assessable space' . . . shall reflect any decrease in assessable space in the same residential structure that also results from that construction." The words "same residential structure" conjure up an image of a remodeling project, not a picture of a complete demolition of an apartment complex and replacement with a single family housing tract with new residential structures distinct from the ones they replace.

(c) *Exemption for redevelopment projects*

The School District also contends that the legislative history shows the Legislature considered and rejected language that would have provided a

statutory exemption for redevelopment projects—exactly the type of exemption Warmington asks us to read into the statute now. As the School District observes, Senate Bill No. 97 (1987-1988 Reg. Sess.), as introduced on December 16, 1986, would have amended Government Code section 65995, subdivision (b)(1), which established the dollar amount of school-impact fees to be levied per square foot of habitable area of residential development. The bill as introduced provided that the term "residential development" would *exclude* "any publicly financed housing project that replaces existing housing units." (Sen. Bill No. 97 (1987-1988 Reg. Sess.) § 4.) However, this language was deleted from Senate Bill No. 97 before it was sent to the Governor. (Sen. Amend. to Sen. Bill No. 97 (1987-1988 Reg. Sess.) Mar. 16 and May 5, 1987.)

But the deletion of this language is not necessarily as telling as the School District would have us believe. In addition to amending Government Code section 65995, Senate Bill No. 97 would have amended former Government Code section 53080 to provide that a school-impact "fee . . . [could] be applied only to new commercial and industrial construction, and, as to residential development, to any construction or reconstruction to the extent of the resulting increase in habitable area." (Sen. Amend. to Sen. Bill No. 97 (1987-1988 Reg. Sess.) Mar. 16 and May 5, 1987.) That language could also be construed as providing the exemption Warmington seeks, without limiting the exemption to publicly financed projects, but making it applicable to any construction or reconstruction, whether publicly or privately financed, to the extent it did not result in an increase in habitable area. Ultimately, Senate Bill No. 97 was vetoed by the Governor, for reasons that may have had nothing whatsoever to do with this issue. (Sen. Bill No. 97, vetoed by Governor, Sept. 30, 1988, Sen. Final Hist. (1987-1988 Reg. Sess.) p. 89.)

■ As for the ultimate significance of the Senate Bill No. 97 amendment the School District cites, very limited guidance can be drawn from a proposed amendment that is not enacted. (*Grupe Development Co. v. Superior Court, supra,* 4 Cal.4th at pp. 922-923.)

(3) *Harmonization with other statutory provisions: Education Code sections 17620, subdivision (a)(1)(A), and 17626*

■ We have other avenues of guidance, however. In construing Education Code section 17620, we must keep in mind each of its provisions as well as other statutes relating to the same subject. We must harmonize all of them to the extent possible. (*Loyola Marymount University v. Los Angeles Unified School Dist., supra,* 45 Cal.App.4th at p. 1261.) ■ Here, we need to

consider both Education Code section 17620, subdivision (a)(1)(A) and Education Code section 17626.

In Education Code section 17620, subdivision (a)(1)(A), the Legislature specifically provided that, "The chargeable covered and enclosed space of commercial or industrial construction shall not be deemed to include the square footage of any structure existing on the site of that construction as of the date the first building permit is issued for any portion of that construction." Thus, the Legislature expressly provided a credit against existing square footage for commercial and industrial construction.[2] However, it did not do the same for residential construction, unless Education Code section 17620, subdivision (a)(1)(C)(i), pertaining to increases in assessable space exceeding 500 square feet, was intended to achieve the same result. If that was the Legislature's intention, it was inartfully stated.

However, it does not appear that was the intention. Education Code section 17626, subdivision (a) provides in pertinent part: "A fee . . . authorized under Section 17620, . . . may not be applied to the reconstruction of any residential, commercial, or industrial structure that is damaged or destroyed as a result of a disaster, except to the extent the square footage of the reconstructed structure exceeds the square footage of the structure that was damaged or destroyed. . . ." (Added by Stats. 1996, ch. 277, § 3; derived from former Gov. Code, § 53080.6, added by Stats. 1989, ch. 1209, § 23, p. 4696.) Education Code section 17626, subdivision (b)(2) defines "reconstruction" as "the construction of property that replaces, and is equivalent in kind to, the damaged or destroyed property."

It appears the Legislature did not think it obvious that the destruction of existing residential units and replacement with newly constructed residential units was exempt under Education Code section 17620, subdivision (a)(1)(C)(i), so it was necessary to create an exemption applicable *when* the destruction was caused by *disaster*. The Legislature made no corresponding exemption when the residential units were destroyed in connection with redevelopment (see *Grupe Development Co. v. Superior Court, supra,* 4 Cal.4th at p. 921 [the statutory exclusion of one class shows the intention to include all other classes]), despite public policy favoring redevelopment (see Health & Saf. Code, § 33037).

We agree with Warmington that to interpret Education Code section 17620 to include an exemption for redevelopment projects would be in

---

[2]We express no opinion as to whether Education Code section 17620, subdivision (a)(1)(A) could be construed as providing a credit only when the credited square footage is retained, as opposed to demolished and rebuilt.

keeping with the underlying purpose of the statutory scheme, i.e., to address the impact on the affected school district of the increase in student population generated by the development. (*Grupe Development Co. v. Superior Court, supra,* 4 Cal.4th at pp. 917-918; *Western/California, Ltd. v. Dry Creek Joint Elementary School Dist., supra,* 50 Cal.App.4th at pp. 1479-1481.) Yet at the same time, when harmonizing section 17620, subdivision (a)(1)(A) and (C)(i) and Education Code section 17626, we find it a strain to adopt Warmington's interpretation. If we were to construe section 17620, subdivision (a)(1)(C)(i) as providing an exemption for new residential structures that replace demolished ones, as opposed to providing an exemption for remodeling projects only, this would render section 17626 superfluous. We must avoid an interpretation that would make some of the words surplusage. (*Victoria Groves Five v. Chaffey Joint Union High Sch. Dist.* (1990) 225 Cal.App.3d 1548, 1552 [276 Cal.Rptr. 14].) We are constrained to conclude that the complete demolition of residential apartments and replacement with newly constructed houses was not intended to fall within the gambit of "other residential construction" entitled to an offset under section 17620, subdivision (a)(1)(C)(i).

Warmington would have us alter the statute so as to provide an exemption for redevelopment projects. Yet "[c]ourts may not rewrite statutes to supply omitted terms or to conform to an assumed, unexpressed legislative intent. [Citation.] It is, of course, up to the Legislature, and not the courts, to rewrite statutes. [Citation.]" (*Western/California, Ltd. v. Dry Creek Joint Elementary School Dist., supra,* 50 Cal.App.4th at p. 1488.)

This does not end our inquiry, however.

D. *Mitigation Fee Act*

(1) *Government Code section 66000 et seq.*

■ We turn next to the Mitigation Fee Act (Gov. Code, § 66000 et seq.). "The Act . . . sets forth procedures for protesting the imposition of fees and other monetary exactions imposed on a development by a local agency. As its legislative history evinces, the Act was passed by the Legislature 'in response to concerns among developers that local agencies were imposing development fees for purposes unrelated to development projects.' [Citations.]" (*Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854, 864 [50 Cal.Rptr.2d 242, 911 P.2d 429].) Warmington has raised the issue whether the fees in question were unrelated to the impact caused by the Redevelopment Project.

Government Code section 66001, subdivision (a) provides as follows: "(a) In any action establishing, increasing, or imposing a fee as a condition of approval of a development project by a local agency . . . , the local agency shall do all of the following: [¶] (1) Identify the purpose of the fee. [¶] (2) Identify the use to which the fee is to be put. . . . [¶] (3) Determine how there is a reasonable relationship between the fee's use and the type of development project on which the fee is imposed. [¶] (4) Determine how there is a reasonable relationship between the need for the public facility and the type of development project on which the fee is imposed."

The question is whether the School District showed the reasonable relationship required under Government Code section 66001, subdivision (a)(3) and (4). To prove that it did, the School District offers the Fee Study, as it did at the trial level.[3]

(2) *The Fee Study*

As the School District says, the Fee Study encompasses an analysis of historical and current enrollment and the enrollment capacity of the School District, a projection of the total amount of new housing expected to be built within the School District, a determination of how many students will be generated by the new housing, and estimates of what it would cost to provide the necessary school facilities for those students. The Fee Study culminates in the following finding: "[T]he amount of fees to be paid by new residential development in the District is reasonably related to the needs of the community for school facilities generated by that development, and does not

---

[3]The School District offers the Fee Study on appeal, just as it did before the trial court, to justify its imposition of fees. It requests this court to take judicial notice of the School District's Resolution No. 08-37-98, by which the School District adopted the Fee Study and, based thereon, adopted the $1.93 per square foot fee for residential construction permitted by Government Code section 65995. We are at liberty to take judicial notice of the resolution as a legislative enactment issued under the authority of a public entity in the United States. (Evid. Code, § 452, subd. (b).)

However, Warmington opposes the request for judicial notice, because the resolution was not placed in evidence before the trial court (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 701, fn. 1 [43 Cal.Rptr.2d 810]) and because it was submitted to this court only after Warmington had filed its respondent's brief. While we are not required to take judicial notice, and Warmington most certainly has raised valid points against doing so, in this particular context it makes little sense to deny the request. Warmington raised the nexus issue and the School District sought to justify its position with the Fee Study. In the proceedings below, the parties argued the significance of the Fee Study, just as they do on appeal. To permit the School District to avoid responding to the nexus argument by omitting to place the resolution in record would do a disservice to all parties and the court. Moreover, taking judicial notice of the resolution will prejudice neither party, inasmuch as this case turns on the Fee Study itself, which was already in issue before the trial court. The School District's request for judicial notice of the resolution is granted.

exceed that development's share of the cost of the facilities." As far as the School District is concerned, the required nexus has been shown and this is the end of the story.

It is not. While the Fee Study does indeed address student generation from new housing in general, and the cost to provide school facilities for new students in the School District, the Fee Study does not specifically address redevelopment.

According to the Fee Study, the portion thereof devoted to residential development "determines the facilities cost impact of an average new home in the District." The Fee Study also states, in the portion thereof dedicated to the cost-per-student analysis, that "[i]n order to assess the impact of new residential construction on the District, one of the required components of the nexus is to determine the cost of providing adequate facilities to house a *new* student within the District; therefore, these project costs serve as the basis for this analysis." (Italics added.) In the portion of the Fee Study on student generation factors, the Fee Study stated, "The survey data reveals that the District must be prepared for the eventuality that each new occupied housing unit may, on the average, produce a peak load of 0.49 students in public school grades K-12."

The Fee Study on its face evaluates the impact of a *new* home and the housing of a *new* student within the School District. The obvious focus of attention is on a newly constructed home that creates an impact on the School District by housing a new student who did not attend school in the School District previously. But the Fee Study gives no thought to the extent of the impact of a tract of homes that are newly constructed in the place of older residential housing previously existing on the same site. It gives no consideration to whether those newly constructed replacement homes in fact generate additional numbers of students over and above those who occupied the previous homes at the site. It certainly gives no consideration to a context such as this, in which 56 residential units were demolished and replaced with only 38. It suggests no method for estimating the impact of new construction in the redevelopment context, in which new homes may generate no more students than replaced homes did previously, or may even generate fewer students.

In support of the Fee Study, the School District filed the declaration of the analyst who had prepared it. Her declaration contains no information whatsoever that would permit us to construe the Fee Study as having given consideration to the impact of redevelopment projects.

### (3) *Reasonable relationship*

Under Government Code section 66001, subdivision (a)(3) and (4), the School District is charged with determining how there is a reasonable relationship between "the fee's use and the type of development project on which the fee is imposed" and between "the need for the public facility and the type of development project on which the fee is imposed." In this case, the School District made no such determination whatsoever with respect to the type of development project in question, i.e., replacement housing in the redevelopment context. It thus failed to meet its obligations under section 66001.

As stated in *Shapell Industries, Inc. v. Governing Board* (1991) 1 Cal.App.4th 218, 235 [1 Cal.Rptr.2d 818], "facilities fees are justified only to the extent that they are limited to the cost of increased services made necessary by virtue of the development. [Citations.] The Board imposing the fee must therefore show that a valid method was used for arriving at the fee in question, 'one which established a reasonable relationship between the fee charged and the burden posed by the development.' [Citations.]"

The *Shapell* court then enunciated the following test: "[S]uch a showing with respect to the fees . . . must involve the interrelation of three elements. First, since the fee is to be assessed per square foot of development, there must be a projection of the total amount of new housing expected to be built within the District. Second, in order to measure the extent of the burden imposed on schools by new development, the District must determine approximately how many students will be generated by the new housing. And finally, the District must estimate what it will cost to provide the necessary school facilities for that approximate number of new students." (*Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th at p. 235.)

The School District contends this is exactly what it did. Yet in actuality, the School District, in using the Fee Study as a basis for imposing school-impact fees on redevelopment construction, failed to meet the first and second prongs of the *Shapell* test. It failed to meet the first prong to the extent that the projection of the total amount of new housing failed to take into consideration the demolition of housing units for redevelopment. Similarly, it failed to meet the second prong because the Fee Study did not approximate the number of students to be generated by redevelopment (i.e., the difference between the number of students that previously inhabited redevelopment sites and the number of students projected to subsequently inhabit those sites).

The court in *Shapell,* in holding the residential fee study before it was flawed, stated that "the court must be able to assure itself that before imposing the fee the District engaged in a reasoned analysis designed to establish the requisite connection between the amount of the fee imposed and the burden created." (*Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th at p. 235.) In the case before this court, as in *Shapell,* no such showing was made. The Fee Study did not address the burden created by redevelopment construction, as opposed to new residential construction that did not displace existing housing, and thus did not show the requisite connection, or "nexus" between the amount of the fee imposed and the burden created. (See also *Balch Enterprises, Inc. v. New Haven Unified School Dist.* (1990) 219 Cal.App.3d 783 [268 Cal.Rptr. 543] [school-impact fee imposed on commercial/industrial development thrown out because of insufficient analysis to support it].)

### (4) *Questions of fact and law*

The School District asserts that to analyze the Fee Study now would require this court to make factual findings not made by the trial court. We reject this argument.

In this case, the "consideration of a theory the trial court did not adopt [does not] involve impermissible appellate fact-finding, as [the School District] . . . contends." (*California State Electronics Assn. v. Zeos Internat. Ltd.* (1996) 41 Cal.App.4th 1270, 1275 [49 Cal.Rptr.2d 127].) In other words, consideration of whether the School District complied with the requirements of Government Code section 66001 does not involve impermissible fact-finding just because the trial court did not base its decision on this ground.

The matter before us does not turn upon a question of fact. Warmington's position was based primarily on legal argument, i.e., that the School District had failed to adhere to the "reasonable relationship" requirements of Government Code section 66001, in essence, because it treated redevelopment construction that displaced existing housing the same way it treated new residential construction that did not displace existing housing. To answer this charge, we need only review the Fee Study.

The adoption of the Fee Study was a quasi-legislative act. (*Western/ California, Ltd. v. Dry Creek Joint Elementary School Dist., supra,* 50 Cal.App.4th at p. 1492.) ▆▆▆ " 'A court will uphold the agency action unless the action is arbitrary, capricious, or lacking in evidentiary support. A

court must ensure that an agency has adequately considered all relevant factors, and has demonstrated a rational connection between those factors, the choice made, and the purposes of the enabling statute.' [Citation.]" (*Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th at p. 232.) "In a mandamus proceeding, the ultimate question, whether the agency's action was arbitrary or capricious, is a question of law. [Citations.]" (*Id.* at p. 233.) Here, the Fee Study does not reflect that the School District adequately considered all relevant factors in imposing the fees on redevelopment construction that displaces existing residential housing. This we decide as a question of law, not a question of fact.

(5) *Application of Government Code section 66001 to individual projects*

The School District also argues that the Fee Study did not need to address the impact on the School District created by individual development projects. In other words, it did not need to address the impact created by the Redevelopment Project in particular. The School District is correct.

"The fact that [Government Code section 66001,] subdivision (a) speaks of a relationship between the use and need on one hand and the 'type' of development on the other . . . defeats any argument that some nexus must be found between the fee and a *particular* project on which it is imposed. The subdivision clearly applies to decisions to impose fees on a *class* of development projects rather than particular ones." (*Garrick Development Co. v. Hayward Unified School Dist., supra,* 3 Cal.App.4th at p. 335.) However, the point of the matter is that the Fee Study did not undertake an analysis of the relationship between the use and need on the one hand and the class of redevelopment construction on the other hand. It addressed the class of new residential construction, but not the class of redevelopment construction that displaces existing residential housing on the same site.

As an aside, the School District mentions that no school facilities fees were previously paid in connection with the former housing units on the site because the units had been constructed before the legislation authorizing such fees took effect. However, the School District does not explain why this should affect the application of Government Code section 66001, or suggest that an exception to the rule should be created depending upon when the demolished housing units were built. In fact, to take this into consideration here would require exactly the type of project-by-project analysis the School District has urged is unnecessary.

## (6) *Trial court proceedings*

In a wholly untenable argument, the School District insists it is too late to address the adequacy of the Fee Study on appeal, because Warmington never challenged the Fee Study and resolution No. 08-37-98 was not before the trial court inasmuch as Warmington "never challenged the authority of the District to impose fees." (See *Loyola Marymount University v. Los Angeles Unified School Dist., supra,* 45 Cal.App.4th at p. 1264 [burden of establishing impropriety of fee not met when fee studies not challenged].)

Yet Warmington's trial court filings are replete with citations to Government Code section 66001, subdivision (a)(3) and (4), and argument to the effect there was no nexus between the fees imposed and the burden caused by the Redevelopment Project. Both parties briefed the nexus issue as well as the significance of *Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th 218. The issue of Government Code section 66001 compliance was squarely before the court, and was one of Warmington's two primary arguments below.

The School District defended its actions with the Fee Study, a copy of which it filed with the trial court, and emphasized that the school-impact fees were imposed based on that study. Warmington addressed the Fee Study also. In its reply in support of its writ petition, Warmington stated the Fee Study "analyzes the impact on the District's facilities caused by new developments in Tustin. It does not analyze redevelopment or even this particular Redevelopment Project." In addition, the Fee Study and the significance of *Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th 218, were both raised at oral argument. It is disingenuous for the School District to claim the issue was not before the trial court just because it omitted to mention in the trial court proceedings that the Fee Study was adopted pursuant to resolution No. 08-37-98 or because Warmington failed to specifically reference the Fee Study or the resolution in its writ petition.

## (7) *Arguments on appeal*

Undaunted, the School District states that Warmington cannot challenge the Fee Study on appeal, because it is charged with the obligation to aid the court of appeal in affirming the judgment, not overturning it. Implicit in this argument is the assertion the trial court, while holding the fees partially invalid under Education Code section 17620, subdivision (a)(1), must have determined the Fee Study was a proper basis for the imposition of the fees,

or the fees could not have been applied at all. The School District cites *Puritan Leasing Co. v. August* (1976) 16 Cal.3d 451, 463 [128 Cal.Rptr. 175, 546 P.2d 679] in support of its argument that Warmington, not having filed a cross-appeal, cannot urge error.

In *Puritan Leasing Co. v. August, supra,* 16 Cal.3d 451, a lessor sued a lessee of certain equipment and the guarantors of the lease for damages for breach of the lease. It obtained judgment against both the lessee and the guarantors, but in an amount less than desired. The lessor appealed, seeking a larger judgment. On appeal, the guarantors asserted that the guarantee was unenforceable. The court held the directed verdict against all defendants had necessarily resolved the issue of the guarantors' liability and the guarantors, not having filed a cross-appeal, were precluded from raising the issue of the enforceability of the guarantee on appeal.

Warmington, like the guarantors in *Puritan Leasing Co. v. August, supra,* 16 Cal.3d 451, has omitted to file a cross-appeal. However, it does not argue that the trial court erred in failing to order a large enough refund. To the contrary, Warmington requests that this court affirm the trial court order.[4] Nothing in *Puritan Leasing Co.* precludes Warmington, in urging affirmance, from asserting the order was correct on more than one ground. (Code Civ. Proc., § 906; *California State Electronics Assn. v. Zeos Internat. Ltd.* (1996) 41 Cal.App.4th 1270, 1275 [49 Cal.Rptr.2d 127].) ▮ Moreover, we must affirm the decision of the trial court if correct on any ground. (*Schubert v. Reynolds* (2002) 95 Cal.App.4th 100, 110 [115 Cal.Rptr.2d 285].)

### (8) *Evidence re impact*

▮ The School District further argues that even assuming the Fee Study is properly before the court, Warmington failed to adduce any substantial evidence to demonstrate any purported flaws in the School District's findings. It relies on *Loyola Marymount University v. Los Angeles Unified School Dist., supra,* 45 Cal.App.4th 1256, in support of its position.

In *Loyola Marymount University v. Los Angeles Unified School Dist., supra,* 45 Cal.App.4th 1256, a private university challenged the imposition of former Government Code section 53080 school-impact fees on its construction of a new building intended to house its business school. The

---

[4]Warmington requests that this court modify the order only with respect to the interest rate to be applied to the refund. It acknowledges that the interest rate applied to the refund is too high. See discussion of interest rate, *post*.

university argued that the purpose of the statute was not furthered by imposing the fees on its business school construction, which should not have been construed as "new commercial [or] industrial construction" within the meaning of former section 53080. The court held the statute did not exempt construction of educational facilities, which it deemed to be commercial in the context before it.

The court also observed that the university had not challenged the factual findings of the school district's fee studies or the application of those findings to the construction of the new business school. The only evidence the university had adduced to the effect that the new construction would not impact local schools was one line in the declaration of a university vice president to the effect that when the business school was completed, " 'the existing school [would] be transferred to the new building with no increase in students or faculty.' " (*Loyola Marymount University v. Los Angeles Unified School Dist., supra,* 45 Cal.App.4th at p. 1264.) It appears the declarant omitted to explain the contemplated fate of the building that had previously housed the business school. In other words, it seems the declarant indicated the new building would house an existing complement of faculty and students, but did not state whether the old building would be used to make room for an additional faculty and student population for which there had previously been no space on campus.

According to the School District, *Loyola Marymount University v. Los Angeles Unified School Dist., supra,* 45 Cal.App.4th 1256, dictates that the school-impact fees must be approved in this case, because Warmington's evidence was deficient to challenge the School District's findings. It asserts the only Warmington evidence pertaining to impact was one line from the declaration of a Warmington official to the effect that "[t]he Redevelopment Project will only result in an increase of approximately 500 square feet per unit." But this was not, in fact, the only evidence before the trial court.

The evidence showed, and the School District does not now dispute, that 56 residential housing units were replaced with 38 residential housing units. In the City Council of the City of Tustin Resolution No. 98-108,[5] concerning the application of Warmington to subdivide the redevelopment site in order to construct the 38 single family homes thereon, the city council found that the subdivision "would not have an impact on School District facilities."

The trial court also had before it the City of Tustin Community Development Department's negative declaration. Of particular importance here, the

---

[5]An incomplete copy of resolution No. 98-108 is contained in the record on appeal. We grant the request of the School District for this court to take judicial notice of a complete copy of the resolution. (Evid. Code, § 452, subd. (b).)

negative declaration stated that "[s]ince the project is an infill project in an existing residential neighborhood, the project would actually reduce population density on the property and in the surrounding area."

The negative declaration further observed that while 56 dwelling units would be demolished, 38 new dwelling units would be constructed, so the School District operations could potentially be impacted by the addition of "any new students." The negative declaration made no prediction as to whether the overall impact on the School District, considering "any new students" occupying the 38 new dwellings versus the previous students occupying the 56 old dwellings, would be positive or negative. However, considering the conclusion that the overall population density would be reduced, one might infer a reduced student population as well.

The School District suggests that, to the contrary, the City of Tustin had in fact concluded that the student population would be increased. The School District bases this assertion on the fact that one of the city's conditions to approval of the subdivision, as contained in resolution No. 98-108, was that before any building permits could issue, Warmington would have to pay "all required fees," including without limitation "[s]chool facility fees to the Tustin Unified School District . . . ." We do not view this condition as support for the School District's proposition. The fact the city required the payment of a variety of governmental fees, such as any applicable School District fees, does not mean that it had determined that School District fees were in fact due and owing, or the amount of those fees. To the contrary, as noted above, the resolution specifically stated the city council found the subdivision would not impact the School District.

In sum, the trial court had before it more substantial evidence than did the court in *Loyola Marymount University v. Los Angeles Unified School Dist.,* *supra,* 45 Cal.App.4th 1256, to challenge the School District's findings concerning impact. Moreover, in *Loyola,* it appears no explanation was given for the fate of the building that had previously housed the business school, leaving open the question whether the university was going to utilize both that building and the new one. In the case before us, on the other hand, the fate of the 56 former housing units is known. They have been demolished and no longer provide housing.

(9) *Conclusion*

As the trial court remarked during oral argument on the writ petition, the School District failed "to meet the argument of impact." Because of this, the

trial court concluded, as a matter of law, that a portion of the fee was improperly levied under Education Code section 17620, subdivision (a)(1). The court was correct that the issue of impact had not been properly addressed as a matter of law, but it cited the wrong legal underpinnings in support of its conclusion. Education Code section 17620 did not provide the sought-after exemption for redevelopment construction. However, the School District failed to adhere to the requirements of Government Code section 66001, subdivision (a)(3) and (4) in imposing the fees.

In *Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th 218, there was enough information in the fee study at issue for the court to determine the amount of school-impact fees properly imposed on residential construction and order a partial refund. However, this is not the case in the situation before us, since the Fee Study did not address redevelopment projects at all. (See *Balch Enterprises, Inc. v. New Haven Unified School Dist., supra,* 219 Cal.App.3d 783, 787, 795 [fee refunded in its entirety].) Under these circumstances, we will affirm the entire refund designated by the trial court. The refund being predicated on the faulty Fee Study, not on the application of Education Code section 17620, subdivision (a)(1), we need not address the School District's arguments about the respective square footage of the demolished units and the replacement units.

(10) *Interest rate on refund*

In closing, the School District argues that the trial court erred in imposing interest at the rate of 10 percent per annum on any refund. It contends that Government Code section 66020, subdivision (e) provides that interest at the rate of 8 percent per annum shall be made on any refunds as a result of a fee protest of this kind. The School District is correct, as Warmington concedes. As stated in *Shapell Industries, Inc. v. Governing Board, supra,* 1 Cal.App.4th at page 241, "Section 66020[, subdivision] (e) provides that in an action protesting the imposition of development fees, if the plaintiff is successful, 'the court shall direct the local agency to refund the unlawful portion of the payment, with interest at the rate of 8 percent per annum . . . .'"

III

DISPOSITION

The order is affirmed to the extent it directs a refund of a portion of the fees Warmington paid to the School District. The order is reversed to the

extent it directs the payment of interest on the refund at the rate of 10 percent per annum instead of 8 percent per annum. The matter is remanded to the trial court for entry of an order consistent with this opinion.

Sills, P. J., and Bedsworth, J., concurred.